No.   95-382

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

C.A. SEYFERTH,

      Petitioner and Appellant,

   V.

STATE OF MONTANA, DEPARTMENT OF
JUSTICE, MOTOR VEHICLE DIVISION,
and CITY OF BILLINGS,

      Respondents and Respondents

APPEAL FROM:   District Court of the Thirteenth Judicial District,
                In and for the County of Yellowstone,
                The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Gary R. Thomas; Thomas Law Office, Red Lodge,
          Montana

      For Respondents:

          Joseph P. Mazurek, Attorney General,
          Brenda Nordlund, Ass't Attorney General,
          Helena, Montana

          Alan Hall, Deputy Billings City Attorney,
          Billings, Montana

FILED

JUL 29 1996

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Submitted on Briefs:   May 16, 1996

Decided:   July 29, 1996

Justice Karla M. Gray delivered the Opinion of the Court.

C.A. Seyferth (Seyferth) appeals from orders of the Thirteenth Judicial District Court, Yellowstone County, denying his petition for reinstatement of his driving privileges and denying his motion to set aside that denial and reopen the proceedings. We affirm.

We restate the issues on appeal as follows:

1. Did the District Court violate Seyferth's right to due process of law by issuing its order denying his petition for reinstatement of his driving privileges, without notice, nearly one year after the hearing on the petition was recessed?

2. Is the District Court's finding that the arresting officer had reasonable grounds to believe that Seyferth was driving under the influence of alcohol clearly erroneous?

3. Did the field sobriety tests violate Seyferth's right to be free from unreasonable searches and seizures and his right to privacy?

Seyferth attended a Christmas party at Jakes, a restaurant and bar in Billings, Montana, on the evening of December 17, 1993. Upon leaving Jakes, Seyferth noticed three police cars stopped nearby with their red and blue lights flashing. A traffic stop was in progress at that location, and Officers Keavin Unruh (Unruh) and Ladd Paulson (Paulson) were assisting a third unidentified officer. After Seyferth drove by the officers, Unruh followed him for several blocks and then pulled him over. Paulson assisted Unruh in the stop.

Unruh asked Seyferth for the usual driving-related documents and told Seyferth that his vehicle's headlights were not on. Unruh noticed that Seyferth smelled of alcohol and that his speech was slurred. After administering field sobriety tests, Unruh arrested Seyferth for driving under the influence of alcohol (DUI), in violation of § 61-8-401, MCA, and took him to the detention facility in Billings. At the detention facility, Unruh advised Seyferth of the implied consent statute and asked him to submit to a breathalyzer test to determine his blood-alcohol content. Seyferth replied that he wanted an attorney and declined to take the test. As a result of Seyferth's refusal to submit to the test, Unruh seized Seyferth's driver's license. The State of Montana, Department of Justice, Motor Vehicle Division (State) subsequently sent Seyferth a letter informing him that his driving privileges were revoked for one year pursuant to § 61-8-402(5), MCA, and that he could petition for reinstatement.

Seyferth petitioned the District Court for reinstatement of his driving privileges and the court reinstated his privileges during the pendency of the proceedings on his petition. At the hearing on his petition in June of 1994, Seyferth moved for a continuance to allow him time to subpoena a witness he had located the night before the hearing and who had agreed to appear and testify. According to Seyferth, the witness would contradict the officers' testimony with regard to whether his vehicle's headlights were on. The State objected on the basis that the proceedings had been initiated in December of 1993, and Seyferth had already

3

obtained several continuances to prepare for the hearing. The District Court noted that Seyferth could have contacted this alleged witness much earlier and denied the motion to continue.

Seyferth, Unruh and Paulson testified at the hearing and the State played the videotaped interview of Seyferth at the detention facility during which he declined to submit to the breathalyzer test. At the conclusion of the hearing, the District Court recessed the proceedings; Seyferth was to locate, and presumably subpoena, the alleged witness who would testify that his vehicle's headlights were on and the State was to aid Seyferth in attempting to determine the identity of the third officer at the traffic stop Seyferth passed before being stopped by Unruh. The court stated that the parties were to report back within two weeks regarding the status of the additional witnesses and "whether we need to reconvene or whether it will be submitted on the evidence that we've taken so far."

Nearly a year passed, and neither Seyferth nor the State contacted the District Court. The District Court deemed the matter submitted and denied Seyferth's petition in May of 1995. Thereafter, Seyferth moved the court to set aside its order denying his petition and reopen the proceedings. The District Court concluded that there was no good cause to reopen the proceedings and denied Seyferth's motion. Seyferth appeals.

> 1. Did the District Court violate Seyferth's right to due process of law by issuing its order denying his petition for reinstatement of his driving privileges, without notice, nearly one year after the hearing on the petition was recessed?

Once a driver's license has been issued, the licensee has an important interest in retaining it; therefore, a license cannot be suspended or revoked without the procedural due process guaranteed by the Fourteenth Amendment. See State ex rel. Majerus v. Carter (1984), 214 Mont. 272, 276, 693 P.2d 501, 503 (quoting Bell v. Burson (1971), 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90). The United States Supreme Court has stated that, in order to satisfy due process requirements in this context, states must afford notice and an opportunity for a hearing. See Bell, 402 U.S. at 542 (citations omitted). A hearing subsequent to revocation or suspension of a driver's license satisfies due process requirements so long as the procedures used prior to revocation or suspension provide a reasonably reliable basis for concluding that facts justify deprivation of a driver's property interest in his or her license. See Mackey v. Montrym (1978), 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321, 331.

Seyferth does not challenge Montana's statutory procedures for revoking or suspending a person's driver's license. He argues that, under the facts of this case, he was entitled to notice prior to the District Court's issuance of an order denying his petition for reinstatement of his driving privileges nearly one year after his hearing was recessed. Seyferth relies on Memphis Light, Gas & Water Div. v. Craft (1977), 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30, in support of his argument that the court's failure to provide such notice here violated his due process rights.

5

In Memphis Light, Willie and Mary Craft (the crafts) were receiving two utility bills from their municipal utility provider instead of one. Memphis Light, 436 U.S. at 4. They paid the undisputed portion of the bills and repeatedly attempted to resolve the double billing problem with their utility provider, Memphis Light, Gas and Water (MLG&W); they received neither a satisfactory explanation for the double billing nor suggestions for further recourse within MLG&W. Memphis Light, 436 U.S. at 5. The Crafts' utility service was terminated numerous times due to nonpayment and the Crafts and other customers filed suit contending that they had a property interest in their utility service while disputed bills remained unpaid and, therefore, were entitled to due process prior to **termination of** service. Memphis Light, 436 U.S. at 5.

The United States Supreme court reviewed Tennessee law governing utilities and concluded that, since utility providers could terminate service only "for cause," the Crafts had a sufficient property interest to implicate Fourteenth Amendment due process rights. Memphis Light, 436 U.S. at 11-12. The Supreme Court reiterated the fundamental requirements of due process that notice be given to interested parties of the pendency of an action and that the parties be provided an opportunity to present objections. Memphis Lisht, 436 U.S. at 13 (citation omitted). "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'" Memphis Light, 436 U.S. at 14 (citation omitted). In reviewing MLG&W's "pay or be terminated" notice, the

Supreme Court held that MLG&W violated the Crafts' due process rights because it did not provide them with "notice reasonably calculated to apprise [them] of the availability of an administrative procedure to consider their complaint of erroneous billing.    ." Memphis Lisht, 436 U.S. at 22.

Here, the State informed Seyferth by letter that his driving privileges were revoked for one year and that he had thirty days to petition for reinstatement in the District Court.  Unlike the Crafts in Memphis Light, Seyferth was provided with notice which apprised him of, and permitted adequate preparation for, a proceeding to challenge the revocation and seek reinstatement of his driving privileges.  See Memphis Light, 436 U.S. at 14.  Thus, the State's letter to Seyferth met the only notice requirement set forth by the Supreme Court in Memphis Light and the case provides no support for Seyferth's argument.

Seyferth's petition was originally scheduled for hearing on February 25, 1994.  The District Court granted Seyferth three continuances and the petition finally was heard on June 22, 1994. At the hearing, Seyferth moved for another continuance; the court denied the motion.  At the conclusion of the hearing, however, the court gave Seyferth an additional two weeks to procure witnesses.

Upon recessing the hearing, the District Court expressly directed the attorneys for Seyferth and the State to report back to it within two weeks regarding "whether we need to reconvene or whether it will be submitted on the evidence that we've taken so far."  Neither Seyferth nor the State reported back to the court

7

within the two-week period and, indeed, the District Court waited nearly a year before issuing its order. Seyferth cites to no authority, and we have found none, under which a party who has had a hearing and been directed to inform the court within two weeks whether reconvening the hearing is necessary, but who fails to contact the court at all, is entitled to further notice prior to court action.

The record indicates that Seyferth had ample opportunity to present his case. His failure to do so does not entitle him to yet more notice and yet another opportunity; nor does it translate into a due process violation by the District Court. Under these facts, we hold that the District Court did not violate Seyferth's due process rights when it issued its order denying his petition for reinstatement of his driving privileges, without notice, nearly one year after the hearing on the petition was recessed.

> 2. Is the District Court's finding that Unruh had reasonable grounds to believe that Seyferth was driving under the influence of alcohol clearly erroneous?

The District court's review of Seyferth's petition for reinstatement of his driving privileges was statutorily limited to three issues: (1) whether Unruh had reasonable grounds to believe that Seyferth had been driving or was in actual physical control of a vehicle upon ways of this state open to the public while under the influence of alcohol, drugs or a combination of the two; (2) whether Seyferth was placed under arrest; and (3) whether Seyferth refused to submit to a blood, breath or urine test, as required by § 61-8-402, MCA. See § 61-8-403(4), MCA. In denying Seyferth's

petition, the District Court found that Unruh had reasonable grounds to believe Seyferth was driving under the influence of alcohol, that Seyferth was arrested and that he refused to submit to the breathalyzer test. Seyferth challenges the "reasonable grounds" finding. We review the District Court's finding to determine whether it is clearly erroneous. See Anderson v. State (Mont. 1996), 912 P.2d 212, 214, 53 St.Rep. 125, 126.

A finding of "reasonable grounds" to make an investigative stop, as required by § 61-8-403(4)(a)(i), MCA, is the equivalent of a finding of "particularized suspicion" to make an investigative stop under § 46-5-401, MCA. Anderson, 912 P.2d at 214 (citation omitted). Section 46-5-401, MCA, provides:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may *stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.*

(Emphasis added.) Because the statute requires some objective manifestation that a person is engaged in criminal activity before a stop can be made, we adopted a two-part test to determine whether an officer had sufficient cause to stop a person. Anderson, 912 P.2d at 214 (citing State v. Gopher (1981), 193 Mont. 189, 631 P.2d 293). First, the State must show objective data from which an experienced officer can make certain inferences. Second, the State must demonstrate a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing or was a witness to criminal activity. Anderson, 912 P.2d at 214. Whether

a particularized suspicion exists is a question of fact which depends on the totality of the circumstances. Anderson, 912 P.2d at 214 (citing State v. Reynolds (1995), 272 Mont. 46, 50, 899 P.2d 540, 542-43).

Here, both Unruh and Paulson testified that, at approximately 11:30 p.m., Seyferth was driving his vehicle without the headlights on; they attempted to get his attention by shining and flashing their flashlights at him as he drove by them. Unruh testified that, despite their efforts, Seyferth drove by and looked at them with "unseeing" eyes "as if he didn't realize what we were doing." On these bases, Unruh suspected that Seyferth was driving under the influence and immediately followed him. Unruh testified that Seyferth stopped abruptly, almost running a red light, then turned a corner to pull over and ran over the curb prior to stopping.

Unruh testified to the extensive and continuing training he has had for detecting when a person is driving under the influence of alcohol or drugs. Moreover, he has made "several hundred" DUI arrests and assisted in "hundreds" of others. According to Unruh, driving without headlights after dark is one sign indicating that a person is driving under the influence. Erratic driving, such as nearly running a red light, stopping abruptly and driving over a curb, is another sign that a person may be driving under the influence.

Unruh is an experienced officer who has participated in hundreds of DUI arrests. He observed Seyferth driving a vehicle after dark without its headlights on, noted "unseeing" eyes and

10

observed erratic driving. Paulson's testimony corroborated the existence of objective data from which Unruh could infer that Seyferth was driving under the influence. We conclude that, under the totality of the circumstances, the evidence of record is sufficient to support a particularized suspicion that Seyferth was driving under the influence of alcohol.

Seyferth relies on his own testimony that his vehicle's headlights were on to support his contention that a particularized suspicion did not exist justifying Unruh's stop. Our standard of review, however, is not whether evidence supports a finding different from that made by the district court. Our standard is whether the court's finding is clearly erroneous. Anderson, 912 P.2d at 214. Where, as here, a district court is the trier of fact, it is within the province of the district court to determine witness credibility and the weight to be given evidence. See Keebler v. Harding (1991), 247 Mont. 518, 523, 807 P.2d 1354, 1357 (citing Matter of Estate of Murnion (19841, 212 Mont. 107, 113, 686 P.2d 893, 896). The District Court apparently found the officers' testimony more credible than Seyferth's in this case and afforded that testimony more weight. We will not substitute our judgment for that of the District Court. See Keebler, 807 P.2d at 1358.

Seyferth also relies on Reynolds in support of his argument that Unruh did not have a particularized suspicion justifying the stop. Reynolds, however, is factually distinguishable.

In Reynolds, a deputy sheriff observed the defendant driving down a dead-end street "'bordering on traveling too fast' for the

11

conditions." Reynolds, 899 P.2d at 542. The deputy drove to where he thought the defendant would end up, eventually meeting the defendant at an intersection where the defendant had the right-of-way. The defendant waited approximately seven to ten seconds before proceeding through the intersection. Reynolds, 899 P.2d at 542. Immediately thereafter, the deputy pulled the defendant over. Reynolds, 899 P.2d at 542.

We noted on appeal that the deputy testified only that the defendant had been driving "'bordering on traveling too fast."' After the initial "possible" traffic violation, the deputy did not observe any erratic driving or traffic violations. Reynolds, 899 P.2d at 543. On the record before us, we determined that the defendant did not exhibit patterns consistent with a person driving under the influence of alcohol. We ultimately concluded that, based on the totality of the **circumstances,** the possible traffic violation on a stand-alone basis was not sufficient to support a particularized suspicion that the defendant had been engaged in criminal conduct. Reynolds, 899 P.2d at 543.

Here, Unruh and Paulson initially observed that Seyferth was driving his vehicle without the headlights on after dark in violation of § 61-g-201, MCA. Seyferth did not respond to the officers' attempt to alert him to that fact by shining and flashing their flashlights at him. Thereafter, Unruh followed Seyferth and observed his erratic driving in nearly running a red light, stopping abruptly and driving up on the curb while pulling over.

12

Thus, in this case an actual traffic violation and other objective data existed which supports a particularized suspicion.

Having determined that, under the totality of the circumstances, the evidence of record is sufficient to support a particularized suspicion, we hold that the District Court's finding that Unruh had reasonable grounds to believe that Seyferth was driving under the influence of alcohol is supported by substantial credible evidence and not otherwise clearly erroneous.

> 3. Did the field sobriety tests violate Seyferth's right to be free from unreasonable searches and seizures and his right to privacy?

On appeal, Seyferth raises numerous constitutional issues relating to the field sobriety tests, including that the tests violated his right to be free from unreasonable searches and seizures, guaranteed by both the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution, and his right to privacy, guaranteed by Article II, Section 10 of the Montana Constitution. Seyferth did not raise these issues regarding the field sobriety tests in the District court.

Seyferth concedes the well-settled principle that we will not address issues raised for the first time on appeal. See Insured Titles, Inc. v. McDonald (Mont. 1996), 911 P.2d 209, 213, 53 St.Rep. 61, 64 (citation omitted). He argues, however, that we should invoke our discretionary power of common law plain error review because these issues affect his substantial rights.

We recently clarified the common law plain error rule in State v. Finley (Mont. 1996), 915 P.2d 208, 53 St.Rep. 310. The power of plain error review

> is inherent in the appellate process itself. Appellate courts have the inherent duty to interpret the constitution and to protect individual rights set forth in the constitution and necessarily have the correlative authority to invoke the plain error doctrine in order to carry out those duties.

Finley, 915 P.2d at 213 (citations omitted). We held that we would review claimed errors that implicate a criminal defendant's, fundamental constitutional rights under the plain error rule only sparingly and only where failing to do so might result in a manifest miscarriage of justice, leave the question of the fundamental fairness of the proceedings unsettled, or compromise the integrity of the judicial process. Finley, 915 P.2d at 215.

We conclude that refusing to review Seyferth's challenges to the field sobriety tests in this civil reinstatement proceeding will not result in a manifest miscarriage of justice, leave the question of the fundamental fairness of the proceedings unsettled, or compromise the integrity of the judicial process. See Finley, 915 P.2d at 215. Accordingly, we decline to address the constitutional issues relating to the field sobriety tests which Seyferth raises for the first time on appeal.

Affirmed.

_____
Justice

14

We concur:

_____
Chief Justice

_____

_____
Justices

15