# STATE OF MONTANA,
## Plaintiff and Respondent,
### v.
# SHANNON LEE SULLIVAN,
# a/k/a SHANNON LEE MARSHNO,
## Defendant and Appellant.

No. 96-009.
Submitted on Briefs October 17, 1996.
Decided November 29, 1996.
53 St.Rep. 1282.
280 Mont. 25.
927 P.2d 1033.

See C.J.S. Criminal Law § 887.

For Appellant: **William F. Hooks**, Appellate Defender, Helena.

For Respondent: **Honorable Joseph P. Mazurek**, Attorney General; **Jennifer Anders**, Assistant Attorney General, Helena; **Christine A. Cooke**, County Attorney; **Curtis Bevolden**, Deputy County Attorney, Hardin.

CHIEF JUSTICE TURNAGE delivered the Opinion of the Court.

Shannon Sullivan appeals from a jury verdict, judgment and sentence of the Thirteenth Judicial District, Big Horn County, convicting him of deliberate homicide. We reverse and remand.

## ISSUE

Did the prosecutor violate Sullivan's right to due process and privilege against self-incrimination by commenting on Sullivan's post-*Miranda* silence and is this issue reviewable under the common law plain error doctrine?

## FACTS

This case arises from events that occurred in Hardin, Montana, on March 20 and 21, 1995. On the afternoon of March 20, Sullivan and the victim, Kevin Lessard (Kevin), stopped at the residence of Ella Deputee, Kevin's mother. Kevin, age seventeen, attended school in Billings, Montana, and was home visiting his family. Sullivan, age twenty-two, was a friend of the Lessards and lived in Leroy Lessard's trailer.

Sullivan and Kevin went fishing with Leroy (Kevin's father), Rowena Lessard (Kevin's sister), Terry Little and Gloria Little Head. Kevin returned to his mother's house for dinner. Ella Deputee recalled that Kevin was in a hurry to return to Leroy's trailer and that he left her house around 8:30 or 9:00 p.m.

Leroy had a .22 magnum pistol in his trailer. According to Leroy, Sullivan was familiar with it. Sullivan and Kevin played with the pistol often, twirling it and trying to act like gunslingers. Occasionally, the pistol was loaded when they played with it. Leroy did not see the .22 on the night of the shooting. However, Rowena Lessard (Rowena) testified that around 9:00 p.m., she saw Kevin place the .22 near the television.

At approximately 10:00 p.m., Sullivan, Kevin, Rowena, Terry, and Gloria left Leroy's trailer to go into town. At 2:00 a.m., they returned to the trailer. There, Leroy visited with a friend, Raymond Holmes. Terry went outside to sleep in his truck, and Gloria went to the back bedroom of the trailer to sleep. According to both Leroy and Rowena, Sullivan and Kevin appeared to be getting along. The two went to the front bedroom, where Sullivan lived, to listen to music. At about 5:00 a.m., Kevin told Leroy that he was going to sleep, and returned to the front bedroom.

Sometime later, Leroy's conversation with Raymond was interrupted by the sound of a gun discharging. Leroy rushed to the back of the trailer where he believed the sound had originated. He heard Rowena call out Kevin's name. Rowena had been awakened by the sound of a gunshot and hurried to the front bedroom where she found Kevin. Leroy ran into the front bedroom where he saw Kevin lying on the bed. He picked Kevin up and held him for several seconds before he ran to a neighbor's house to call for help. Leroy returned to his trailer until the police arrived. At approximately 6:00 a.m. Kevin was pronounced dead by the Big Horn County Coroner.

Dr. Kenneth Mueller performed an autopsy on Kevin. In his opinion, the cause of Kevin's death was a close-range penetrating small-caliber gunshot wound to the head. Dr. Mueller opined that the gun was between six and twelve inches away from Kevin when it was discharged, and the presence of powder burns on Kevin's eyelids suggested that his eyes were closed when the gun was discharged.

Rowena and Leroy did not see Sullivan after they heard the gun discharge. Immediately after the shooting, no one except Sullivan left Leroy's trailer. The back door to the trailer, which had been closed earlier, was open. Leroy did not see the .22 after the shooting.

Approximately twenty-four hours later, Sullivan appeared at the home of Ralph Turns Plenty. Turns Plenty knew there was something wrong because the tribal police had been to his residence on the previous day looking for Sullivan. Turns Plenty advised Sullivan to turn himself in to the police. Sullivan agreed, and one of Turns Plenty's sons contacted the Big Horn County Sheriff's Office. Big Horn County Sheriff Larson Medicinehorse arrived, picked up Sullivan for questioning, and took him to his office. There, Big Horn County Chief Detective John Shaw spoke with Sullivan. He advised Sullivan of his *Miranda* rights and asked if he would be willing to make a statement. Sullivan refused. Shaw stopped the interview, excused himself, and left.

Sullivan was released and spent the night at the Turns Plenty residence. The next day, Sheriff Medicinehorse, accompanied by Bureau of Indian Affairs Criminal Investigator Wesley Stops, returned to the Turns Plenty residence. Stops showed Sullivan the waiver of rights form that he had signed one day earlier. Stops asked Sullivan if he understood his *Miranda* rights, and Sullivan said that he did. Stops then conducted a tape-recorded interview.

Sullivan explained how the shooting occurred. According to Sullivan, he and Kevin returned to Leroy's trailer and entered the front bedroom. He picked up Kevin's pistol, and while talking to Kevin, twirled it. Sullivan was standing at the foot of the bed, and Kevin was lying on it. The pistol went off, shooting Kevin. Sullivan said that he stood and looked at Kevin for several seconds but then became afraid and ran out of the trailer. After leaving, he threw the pistol into a dumpster. Sullivan tried to describe the location of the dumpster to Stops. However, despite the description and a police search, the pistol was never found.

The State of Montana charged Sullivan by information with deliberate homicide. Sullivan pleaded not guilty. At trial, he did not dispute the State's claim that he shot and killed Kevin, but maintained that the shooting was accidental. The defense argued that Sullivan was guilty of negligent homicide rather than deliberate homicide. Sullivan did not testify.

In his opening statement, the prosecutor informed the jury that the shooting was deliberate. He explained how Sullivan fled immediately after the shooting, disposed of the murder weapon, and hid for twenty-four hours before turning himself in to authorities. Then he informed the jury that Sullivan refused to give a statement after being advised of his *Miranda* rights. "The defendant, when he did

turn himself in, refused to give a statement at first when advised of his rights by Chief Detective John Shaw."

During the defense's opening statement, counsel explained,

Detective Shaw brought [Sullivan] down to the police department and read him his rights and asked him if he would give a statement, whereupon Mr. Sullivan became frightened again and wouldn't say—he didn't want to—he didn't want to talk at that point.

During the State's case-in-chief, two witnesses testified concerning Sullivan's silence. The prosecutor questioned Detective Shaw about the conversation he had with Sullivan on the first day he was brought to the sheriff's office and was advised of his *Miranda* rights.

Q. The first time [Sullivan] came to the Sheriff's office did you speak with him?

A. Yes, I did.

Q. What was the extent of that conversation?

A. Very brief. I read an adult waiver form to him, essentially advising him of his *Miranda* rights. I asked him if he would be willing to speak with me and give a statement at that time. He refused. I excused myself and left.

Later in the State's case-in-chief, the prosecutor asked Sheriff Medicinehorse if Sullivan had said anything to him:

Q. Did he say anything to you when you brought him in that first day?

A. No, he did not.

Q. Sat quietly during the ride?

A. Yes.

Q. He didn't produce a handgun for you at any time, did he?

A. No, he did not.

During his closing argument, the prosecutor commented twice to the all-female jury on Sullivan's failure to give a statement to the police after the shooting. He stated:

I suggest, based on your common experience as ladies, that if you commit an accident, particularly if someone had committed an accident as horrible and as tragic as this particular accident, *wouldn't you want to tell somebody it was an accident,* how sorry you were, that you didn't mean to do it? Would you get rid of the gun? Dispose of it? [Emphasis added.]

Later, in closing argument, the prosecutor argued, "[Sullivan] has the better part of twenty-four hours to turn himself in and then another

twenty-four hours before he gives a statement. And his mistake is that his statement is absolutely, totally inconsistent with this physical evidence." Defense counsel did not object to any of the prosecutor's comments or to the testimony elicited during the State's case-in-chief.

The District Court instructed the jury on both deliberate and negligent homicide. The jury returned a verdict finding Sullivan guilty of deliberate homicide. The District Court sentenced Sullivan to fifty years at the Montana State Prison, with ten additional years for the use of a weapon.

Sullivan appeals.

## DISCUSSION

Did the prosecutor violate Sullivan's right to due process and privilege against self-incrimination by commenting on Sullivan's post-*Miranda* silence and is this issue reviewable under the common law plain error doctrine?

Sullivan argues that his right to due process and privilege against self-incrimination were violated when the prosecutor commented in his opening statement and closing argument, and elicited testimony during the State's case-in-chief, that Sullivan declined to make a statement after being advised of his *Miranda* rights. The State responds, and Sullivan concedes, that defense counsel failed to make a timely objection to these alleged errors. The State argues that Sullivan's claims are barred from consideration on appeal because he does not meet the exceptions of Montana's plain error statute, § 46-20-701, MCA. Sullivan counters that this Court should review the alleged errors by applying the common law plain error doctrine as outlined in *State v. Finley* (1996), 276 Mont. 126, 915 P.2d 208, 212-16.

In *Finley*, we explained under what circumstances we would apply common law plain error review. We will discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, where failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. *Finley*, 915 P.2d at 215.

The plain error rule is of limited application and is to be used sparingly. *State v. Arlington* (1994), 265 Mont. 127, 152, 875 P.2d 307, 322. Since *Finley*, we have declined to apply common law plain error review in the following cases: *State v. Swoboda* (1996), 276 Mont. 479, 918 P.2d 296, (failure to consider alternatives to imprisonment); *State*

*v. Monaco* (1996), [277 Mont. 221], 921 P.2d 863, (allowing testimony concerning statements made in related civil proceeding); and *Seyferth v. State Dept. of Justice* (1996), [277 Mont. 377], 922 P.2d 494 (challenges to sobriety test).

The State attempts to distinguish *Finley* from the facts of the case presently before us, arguing that the common law plain error doctrine was adopted in *Finley* because that case turned on witness credibility. We decline to distinguish the facts of *Finley* from those of the case at bar. In *Finley*, we made no suggestion that our recognition of the common law plain error doctrine was decided because the State's case essentially boiled down to a test of witness credibility.

The State also encourages this Court to follow *State v. Huebner* (1992), 252 Mont. 184, 827 P.2d 1260, and refuse to invoke plain error. In *Huebner*, the defendant was convicted of wasting game in violation of § 87-3-102, MCA (1989). On appeal, Huebner challenged, for the first time, the legal sufficiency of the jury instructions. We declined to invoke plain error review to invalidate the jury verdict, concluding, "because Huebner's own testimony established all of the elements of the offense with which he was charged, those issues, as well as the issues concerning ... references to his exercise of Fifth Amendment rights, could not have resulted in any prejudice to him." *Huebner*, 827 P.2d at 1264.

The facts of *Huebner* differ from the case at bar. Sullivan did not testify at trial. Nor did his testimony "establish all of the elements of the offense with which he was charged." Sullivan does not dispute the sufficiency of the evidence presented by the State at trial. Rather, he challenges the fundamental fairness of a trial where the prosecutor commented on his post-*Miranda* silence.

The State suggests that this Court should apply a harmless error standard to the plain error doctrine. The State argues that, because the physical evidence presented at trial directly conflicted with Sullivan's version of the shooting, the prosecutor's comments were harmless. However, that is not the standard that we articulated in *Finley*. When invoking the plain error doctrine, we consider the nature of the constitutional rights implicated and the fairness of the proceedings—not the sufficiency of the evidence. *Finley*, 915 P.2d at 215.

When determining whether to apply the common law plain error rule, we must decide whether the errors alleged by Sullivan implicate fundamental constitutional rights. Sullivan argues that the prosecutor's comments and elicited testimony violated his right to due process and his privilege against self-incrimination. These are both

undeniably fundamental constitutional rights. *Finley*, 915 P.2d at 216; U.S. Const. amend. V; Art. II, Sec. 17, Mont. Const.; U.S. Const. amend. XIV, § 1; Art. II, Sec. 25, Mont. Const.

Because of the importance of these rights and the effect that a denial of these rights would have on the fairness of a trial, and notwithstanding defense counsel's failure to contemporaneously object or to claim error pursuant to § 46-20-701(2), MCA, our failure to review Sullivan's claims would leave unsettled a question as to the fundamental fairness of his trial.

As in *Finley*, we again emphasize the necessity for counsel to contemporaneously object to claimed errors made at trial. Trial courts must first be given the opportunity to cure claimed errors. We also note the difficulty that we face when invoking the common law plain error doctrine to review alleged violations of a defendant's fundamental constitutional rights. If the alleged violation affects a defendant's fundamental constitutional rights, why did trial counsel fail to object?

■ Having determined that Sullivan raises issues that affect his fundamental constitutional rights, we next inquire whether the prosecutor's comments and the testimony that he elicited during the State's case-in-chief violated Sullivan's right to due process of the law under the Fourteenth Amendment of the United States Constitution and Article II, Sec. 17, of the Montana Constitution.

Sullivan argues that the prosecutor's comments concerning his post-*Miranda* silence made during the State's opening statement and closing argument and the testimony elicited during the State's case-in-chief violated his right to due process of law as set forth in *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. The State responds that *Doyle* and other cases relied on by Sullivan do not apply because in those cases the government's case was weak or largely circumstantial and there was no physical evidence to resolve the discrepancy between the State's witnesses and the defendant's trial testimony.

In *Doyle*, the United States Supreme Court held that a prosecutor's use of a defendant's silence maintained after *Miranda* warnings for impeachment purposes was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him that his silence will not be used against him. *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245. The Court explained that

> [W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty ... it would be fundamentally unfair and a deprivation of due process to allow the

arrested person's silence to be used to impeach an explanation subsequently offered at trial.
*Doyle*, 426 U.S. at 618, 96 S.Ct. at 2245.

We have held that *Doyle* does not apply to pre-arrest silence where the defendant has not been advised of his right to remain silent. *State v. Furlong* (1984), 213 Mont. 251, 258, 690 P.2d 986, 989; *State v. Sadowski* (1991), 247 Mont. 63, 76, 805 P.2d 537, 545. We reasoned that *Doyle* is "based on principles of fundamental fairness that a defendant's silence *after* receipt of governmental assurances [will] not be used against him. ..." *Sadowski*, 805 P.2d at 545. In the instant case, the record indicates that Sullivan did not receive a *Miranda* warning until he was brought to the Big Horn County Sheriff's Office and questioned by Detective Shaw. Sullivan had not been advised of his right to remain silent and was not subsequently punished at trial for having invoked that right when the prosecutor questioned Sheriff Medicinehorse about whether Sullivan had made a statement while being transported. Therefore, we hold that Sullivan's right to due process was not violated, and no *Doyle* error occurred, when the prosecutor questioned Sheriff Medicinehorse about whether Sullivan had said anything during the ride to the sheriff's office.

We next consider whether the prosecutor's opening statement, closing argument, and questioning of Detective Shaw violated Sullivan's due process rights. The State correctly points out that *Doyle* and the holdings of *Sadowski* and *Furlong* prohibit prosecutorial comments on a defendant's post-arrest silence for impeachment purposes. However, these cases do not speak to a situation, such as Sullivan's, where the defendant did not testify at trial and was never subject to cross-examination and impeachment by the State.

Therefore, we must decide whether a defendant's due process rights are violated when a prosecutor comments on a defendant's post-arrest silence at a trial where the defendant does not testify. The Ninth Circuit Court of Appeals addressed this issue in *United States v. Newman* (9th Cir. 1991), 943 F.2d 1155, and in *United States v. Baker* (9th Cir. 1993), 999 F.2d 412.

In *Newman*, the defendant's post-arrest silence was referred to on three occasions by government witnesses, who testified that after being advised of his *Miranda* rights, the defendant declined to make a statement. The Ninth Circuit held that the testimony constituted *Doyle* error. *Newman*, 943 F.2d at 1157. In *Baker*, the defendant refused to testify at trial. During rebuttal, the prosecutor commented

on the defendant's post-arrest silence. The Ninth Circuit found *Doyle* error. *Baker*, 999 F.2d at 416.

The record in this case indicates that the prosecutor commented on Sullivan's silence in his opening statement, introduced testimony regarding Sullivan's decision to remain silent during direct examination of Detective Shaw, and commented on Sullivan's silence two times in his closing argument. In *United States v. Wycoff* (9th Cir. 1976), 545 F.2d 679, the Ninth Circuit explained the effect of informing a jury that the defendant remained silent. "The natural tendency of the use of testimony in this matter is to prejudice the defendant by attempting to create an inference of guilt in the jury's mind." *Wycoff*, 545 F.2d at 681. Sullivan was entitled to remain silent when asked by Detective Shaw whether he wished to make a statement. This silence should not be used by the State to suggest that Sullivan was guilty of deliberate homicide. We hold that the prosecutor committed *Doyle* error when he commented on Sullivan's post-*Miranda* silence during the State's opening statement, case-in-chief, and closing argument.

The State suggests that, even if the prosecutor's comments constituted *Doyle* error, such error was harmless. For error to be harmless, the State must show beyond a reasonable doubt that the error did not contribute to the verdict obtained. *State v. Rothacre* (1995), 272 Mont. 303, 312-13, 901 P.2d 82, 88; *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-11. We agree with this standard in reviewing harmless error.

In opening statements, the prosecutor mentioned that Sullivan refused to give a statement to Detective Shaw after being advised of his *Miranda* rights. The prosecutor received testimony regarding Sullivan's post-*Miranda* silence from Detective Shaw. During closing argument, the prosecutor commented two more times on Sullivan's silence when he argued that Sullivan should be found guilty of deliberate homicide. The prosecutor's inference in all these statements was that Sullivan must be guilty of deliberate homicide because a person guilty of negligent homicide in an accidental shooting would have explained his actions sooner than Sullivan did and would not have remained silent. Here, the prosecutor used Sullivan's silence to prove that he was guilty of deliberate homicide.

We agree that the circumstantial evidence supporting Sullivan's deliberate homicide conviction was not weak. However, this is not an excuse for allowing the prosecutor to comment on Sullivan's post-*Miranda* silence. *See Newman*, 943 F.2d at 1158 (conviction reversed on

*Doyle* error when all evidence circumstantial); *Scarborough v. Arizona* (9th Cir. 1976), 531 F.2d 959, 962 (*Doyle* error found when evidence weak upon which jury could have acquitted).

We conclude that the four separate comments made in the State's opening statement, during the testimony of Detective Shaw, and during the State's closing argument regarding Sullivan's post-*Miranda* silence were not harmless beyond a reasonable doubt. These comments and testimony that Sullivan declined to give a statement to law enforcement officers after being advised of his *Miranda* rights violated Sullivan's right to due process. By making these comments, the State created an inference for the jury that, by remaining silent after having been read his rights, Sullivan was guilty of deliberate homicide.

■ The State also argues that defense counsel commented on Sullivan's post-*Miranda* silence during his opening statement, cross-examination of Sheriff Medicinehorse, and closing argument, thus "opening the door" to further discussion on the issue. This Court has refused to reverse an alleged *Doyle* violation when defense counsel opened the door by first inquiring into the defendant's silence as proof of innocence rather than as an exercise of his *Miranda* rights. *See Sadowski*, 805 P.2d at 546; *State v. White* (1982), 200 Mont. 123, 127-128, 650 P.2d 765, 767-768.

The State's reliance on *White* and *Sadowski* is incorrect. Unlike the defendant in *White*, Sullivan did not testify and make "positive assertions in his direct testimony which put in issue his silence." *White*, 650 P.2d at 768. Contrary to *Sadowski*, Sullivan's attorney never alluded to his client's post-*Miranda* silence during cross-examination of a government witness. Defense counsel did not "open the door" by initially commenting on Sullivan's post-*Miranda* silence. The comment was made in response to a statement initially raised by the State.

After reviewing the claimed violation of Sullivan's fundamental constitutional rights under the common law plain error doctrine, we conclude that the prosecutor's statements and the testimony elicited during the State's case-in-chief concerning Sullivan's post-*Miranda* silence constituted *Doyle* error and violated Sullivan's right to due process of law as guaranteed by the Fourteenth Amendment and Article II, Sec. 17, of the Montana Constitution. The prosecutor elicited comments from Detective Shaw. The prejudicial effect of that testimony, coupled with references to Sullivan's silence made in the State's opening statement and closing argument, suggested to the

jury that Sullivan was guilty of deliberate homicide because an innocent person would not have remained silent.

 Sullivan also argues that the State violated his constitutional right against self-incrimination by commenting during trial on his post-*Miranda* silence. The Fifth Amendment[1] to the United States Constitution, applicable to the states through the Fourteenth Amendment, and Article II, Sec. 27, of the Montana Constitution[2] guarantee against self-incrimination.

In this case, Sullivan exercised his *Miranda* rights by declining to make a statement after being questioned by Detective Shaw. Sullivan also invoked his Fifth Amendment right against self-incrimination when he declined to testify at trial. The State's comments and testimony concerning Sullivan's right to remain silent is a clear violation of these rights.

Reversed and remanded.

JUSTICES HUNT, TRIEWEILER and LEAPHART concur.

JUSTICE GRAY, specially concurring.

I specially concur in the Court's opinion.

For the reasons stated at some length in my dissent in *Finley*, I continue to strenuously disagree that we should apply the common law plain error doctrine absent a successful constitutional challenge to § 46-20-701(2), MCA, the plain error statute duly enacted by the Montana Legislature. *See Finley*, 915 P.2d at 222-23 (Gray, J., dissenting). Having failed to convince my brethren of their error in the context of *Finley*, however, I am now bound to recognize—and to apply—the Court's holding therein as the law of the state of Montana.

That said, I concur entirely in the Court's analysis and resolution of the issue of whether the prosecutor's comments on Sullivan's post-*Miranda* silence violated Sullivan's right to due process and privilege against self-incrimination. I join the Court in reversing and remanding.

1. The Fifth Amendment to the Constitution of the United States reads in relevant part: "No person shall be ... compelled in any criminal case to be a witness against himself ..."

2. Article II, § 25 of the Montana Constitution reads: "No person shall be compelled to testify against himself in a criminal proceeding."