No. 01-890

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 197

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

TRACEY RAYMOND GODFREY,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-first Judicial District,
In and for the County of Ravalli, Cause No. DC 99-114
The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright (argued), Appellate Defender Office, Helena, Montana

    For Respondent:

        Hon. Mike McGrath, Montana Attorney General, Tammy K.
Plubell (argued), Assistant Attorney General, Helena, Montana;
George H. Corn, Ravalli County Attorney, Hamilton, Montana

Heard at oral argument:  May 6, 2003
Submitted:  September 9, 2003
Decided:  July 28, 2004

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Tracey Raymond Godfrey appeals from the jury verdict, judgment, and sentence of the Twenty-first Judicial District, Ravalli County, in which he was convicted of one count of Felony Sexual Assault.  We affirm.

## ISSUE

¶2      We restate the issue as follows:  Should this Court invoke the common law doctrine of plain error and conclude that the prosecutor violated Godfrey's Constitutional right to due process by commenting during trial on his pre-trial silence?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      In the summer of 1999, S.M. and her five children returned to Montana after living out of state for a few years.  S.M.'s two oldest children are K.M. and her twin sister, who were about nine years old at the time.  The twins are the biological daughters of Godfrey's twin brother.  Godfrey expressed a desire to become involved in the children's lives, and began spending his Saturdays with them.  Although S.M.'s other children are not blood relatives of Godfrey, he took them with the twins on a variety of outings, including swimming, hiking, and shopping.  The children occasionally spent the night at Godfrey's residence--a converted school bus located about one hundred yards from his grandmother's home.

¶4      On October 1, 1999, S.M. was hospitalized for the birth of her sixth child.  She had arranged ahead of time for Godfrey and her friend Lucy Salazar to take care of her other children during her hospital stay.  Godfrey picked the children up after work on Friday,

2

October 1, and took them to Pizza Hut for dinner. Afterward, he returned with the children to S.M.'s residence and stayed there until someone else arrived to care for them. The following morning, he picked up S.M.'s children and Salazar's son, and they spent the day "hiking, swimming and hanging out at the bus." On October 3, he drove the children to meet Salazar, in whose care the children were to remain until S.M. was released from the hospital. Godfrey and Salazar conversed briefly before Godfrey left.

¶5    Salazar testified that she met Godfrey through her friendship with S.M. and that Godfrey had occasionally included her son in the outings with S.M.'s children. Salazar testified that she helped the children get ready for bed on October 3 and K.M. told her that Godfrey had "put his hand in her night pants" the previous night. K.M.'s "night pants" are pull-up training pants that she wears to bed because she has a medical condition which causes frequent bed-wetting accidents. Salazar said K.M. told her that Godfrey had held her tightly across her stomach and pulled her toward him, that K.M. told Godfrey, "it hurt," and that Godfrey replied, "it's supposed to hurt." When S.M. came home from the hospital on October 4, Salazar informed her of the conversation she had had with K.M.

¶6    K.M. had not said anything to S.M. about the incident with Godfrey. S.M. asked K.M.'s school teacher Elizabeth Jameson for advice before broaching the subject with K.M. Jameson conducts weekly class meetings with her students on a variety of topics. At least once per year, she discusses the difference between "good touches" and "bad touches." Jameson decided to use that as the topic of her meeting on October 7. At trial, Jameson testified that K.M. approached her after the October 7 class meeting and stated that she had

3

been touched in a bad way by Godfrey, and that he had pulled down her pants while she was lying on his couch. Jameson encouraged K.M. to discuss the incident with S.M.

¶7     S.M. testified that as soon as K.M. returned from school on October 7, K.M. told her that Godfrey had pulled down her "night pants" while she was sleeping on the couch, and that "he was snuggling very tightly and closely from behind her." K.M. also told S.M. that she felt Godfrey's "private part" in her "bottom cheeks."

¶8     On October 8, S.M. called the police and stated that she believed Godfrey had molested K.M. Detective David Potter, who is specially trained to interview child victims in sex abuse cases, conducted an hour-long videotaped interview with K.M. During the interview, K.M. told him that she was afraid she was going to have a baby because of what Godfrey did to her, and explained, "He was doing it to me." She also told Potter there had been a similar incident with Godfrey earlier in the summer when he had put his "private" between her "bottom cheeks." She stated that she had never seen his "private," but felt it.

¶9     The following day, Potter went to Godfrey's bus with a search warrant. Potter handcuffed Godfrey and told him that K.M. had been sexually assaulted. Potter collected a blanket, Godfrey's cut-off shorts, and some other items and left. He did not question Godfrey, nor did he arrest him or read him his rights. Godfrey did not speak with anyone else connected with the case until his arrest on October 22.

¶10    No law enforcement officer ever gave Godfrey a Miranda warning. However, Godfrey signed an Acknowledgment of Rights form on November 2, 1999. The Acknowledgment required Godfrey to place his initials next to each item in a list which

4

enunciated various rights, including one which read, "During these criminal proceedings and trial I understand I have the right to . . . remain silent. The State may not force me to testify and incriminate myself." Godfrey went over this document with his attorney. When Godfrey made his initial appearance in court on November 17, 1999, the District Court questioned him about the Acknowledgment to ensure that he had indeed signed it and that he understood its contents. The Acknowledgment was subsequently filed in the record.

¶11 When K.M. testified at Godfrey's trial, she recalled that she fell asleep on Godfrey's couch while watching television on October 2. Her sisters were sleeping on a bed in the back of the bus. K.M. woke up in the middle of the night and Godfrey was, "hanging onto my waist and scooting me close to his private." She stated Godfrey pulled her pants down and she felt his "private" against her bottom, and that it felt "like it was sticking to my bottom." K.M. did not remember telling Salazar that Godfrey was hurting her or that he replied, "It's supposed to hurt," and she did not remember telling Potter, "He was doing it to me." She did remember telling Potter "someone told me if you do stuff like that, you'll have a baby."

¶12 K.M. also testified that Godfrey had touched her in a similar manner earlier in the summer after they returned to his bus after swimming. K.M.'s sisters had gone next door to Godfrey's grandmother's home, but she was cold and got into bed to get warm and Godfrey climbed into bed with her. She stated that he was "scooting close" behind her and that she felt, "his private between my bottom cheeks." Wanting to get out of the situation, she asked

5

him if she could go to his grandmother's house, but before he responded, her sisters returned to the bus.

¶13    K.M. stated that those were the only two such incidents with Godfrey. She asserted that she had never seen Godfrey's "private part," that he never asked her to touch it, that he did not tell her that anything that happened between them was a secret, and that he did not warn her against telling anyone about it.

¶14    Godfrey testified in his defense at trial. He recalled that he had taken his nieces on a variety of outings during the summer of 1999, and that they had stayed overnight about six times. He explained that during one swimming excursion in mid-June, they returned to his bus because of a sudden storm. He had the children wait in his car while he went inside and changed into dry clothes. After he changed, he told the children they could come in, and he lay down on his bed. K.M. said she was cold and asked if she could get into bed. K.M. was wearing a t-shirt over her bathing suit and Godfrey was wearing cut-off shorts. He stated that he hugged her to him to warm her up, but he did not remove any of their clothing or touch her below the waist, and that they remained in bed a half-hour to forty-five minutes. During this time, the other kids were running in and out of the bus and some of them went over to his grandmother's residence. He denied having any sexual contact with K.M. at any time.

¶15    Godfrey further testified that he continued to babysit the children on a regular basis. In September, S.M. asked Godfrey to watch the children for part of the time that she would

6

be in the hospital to deliver her sixth child. On October 2, Godfrey brought S.M.'s five children and Salazar's son to spend the day with him and stay overnight on his bus.

¶16 After the children went to bed, Godfrey put more wood in the fireplace, sat down on the couch where K.M. was sleeping, and smoked a cigarette. He stated that he rested his arm on K.M.'s hip and that her hip seemed wet. He knew she had bed-wetting accidents, and he decided to hang her bottoms up to dry because she did not have a change of clothes with her. He stated that he pulled her pants by the ankle and was tugging them off when she woke up and complained that she was hot. He stated,

> [M]y immediate reaction was to console her. . . . I leaned over on my elbow and I gave her a hug and I said, I know, and I said I was sorry and I said I loved her anyway, and then I asked her if she had an accident. Because I was trying to explain what I was doing by hanging up her pants to dry. She said that she did not have an accident, which made me wonder why her pants were wet to the touch. . . . I felt between her legs and it . . . felt like she had an accident. . . . I felt for a wet spot underneath that blanket that was on the couch. . . . There was no wet spot and I was just about to tell her that Uncle Tracey made a mistake . . . and that was when she asked if she could sleep on the floor.

He refused because the floor was dirty and told her to go back to sleep.

¶17 Godfrey testified that the next day, he dropped the children off with Salazar, and did not hear anything until October 8, when Detective Potter came to the bus with a search warrant.

¶18 Godfrey's appeal stems from two instances of prosecutorial conduct. First, the prosecutor began his cross-examination of Godfrey as follows:

> Q: Mr. Godfrey . . . how old are you?
> A: I'll be 35 December 15.

7

Q: Old enough to have explanations for certain events; isn't that right?
A: I'm not following you.

Q: Well, you have an explanation for what took place in October in your bus, don't you?
A: That's the truth.

Q: And you have another explanation for what took place in the summer of '99 in the bus, don't you?
A: Yes.

Q: Okay. And it's been nearly seven months since the time of that initial search warrant, hasn't it been?
A: Yes.

Q: So, you had seven months to think up an explanation, isn't that true?
A: I didn't think nothing up. I'm telling the truth.

Q: And this is the first time that anyone has really heard this explanation; isn't that correct?
A: No, it's not.

¶19 Godfrey's counsel did not object to this line of questioning. The second incident occurred at the end of trial, when in his closing argument, and again without objection from Godfrey's counsel, the prosecutor stated,

> He knew it was always going to be his word or my word type of thing. He always knew that. He's not a dummy. You saw him testify. He articulates well. He's got an explanation. He's had plenty of time to think about it.

¶20 The jury trial took place on April 24 and 25, 2000. The jury began deliberating on April 25, 2000, and reached its verdict the following day. The jury acquitted Godfrey of one count of sexual assault and one count of attempted sexual intercourse without consent, but convicted him of a second count of sexual assault.

8

¶21 On July 24, 2000, the District Court sentenced Godfrey to thirty years in prison for sexual assault. Because he was on probation for two felony DUI offenses at the time of the incident with K.M., the District Court found him to be a persistent felony offender and imposed an additional ten-year sentence to run consecutively. The suspended portion of Godfrey's DUI sentence was revoked, and an additional one-year consecutive sentence was imposed, for a total sentence of forty-one years with no time suspended. Godfrey timely appealed this conviction. Godfrey also appeared before the Sentence Review Division, which amended his sentence to a sixty-year prison term with thirty years suspended.

## STANDARD OF REVIEW

¶22 This Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental Constitutional rights, even if no contemporaneous objection is made and notwithstanding the applicability of § 46-20-701(2), MCA, criteria, where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Finley* (1996), 276 Mont. 126, 137, 915 P.2d 208, 215. We use our inherent power of common law plain error review sparingly, on a case-by-case basis, and only in the class of cases aforementioned. *Finley*, 276 Mont. at 138, 915 P.2d at 215.

## DISCUSSION

¶23 Godfrey urges this Court to invoke plain error and reverse his conviction. He contends that his Constitutional right to due process was violated when the prosecutor

9

exploited his exercise of his right to remain silent, by referencing during cross-examination and closing argument the fact that Godfrey offered for the first time at trial an explanation of the incidents with K.M. that he had not offered prior to taking the stand. Godfrey claims the prosecutor implied that he remained silent earlier because he was guilty, and that Godfrey lied to the jury when he related his version of events.

¶24 Because Godfrey's trial counsel did not object to the prosecutor's questioning or comments, Godfrey urges this Court to apply the common law doctrine of plain error review. In *Finley*, this Court held that it would discretionarily consider appeals on this basis in a narrow class of cases. *Finley*, 276 Mont. at 137-38, 915 P.2d at 215. There, we relied upon the United States Supreme Court's holding in *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91, in which the Court held that using a defendant's post-*Miranda* silence as evidence of guilt violated the due process clause of the Fourteenth Amendment. We agreed in *Finley* that a defendant's right to due process is violated if he chooses to remain silent after receiving a *Miranda* warning, and his silence is then commented upon by the prosecutor at trial as evidence of guilt. *Finley*, 276 Mont. at 138, 915 P.2d at 216. We noted, however, that Finley had not actually received *Miranda* warnings and thus had not been induced into remaining silent. *Finley*, 276 Mont. at 141, 915 P.2d at 218.

¶25 Godfrey argues that, taken as a whole, the case against him was "a close one." He points out that the State put on only five witnesses--K.M., and four people who buttressed her story by relating how K.M. had described the incidents to them. Because there was no physical evidence, the case was comprised of Godfrey's word against K.M.'s.

10

¶26    Godfrey claims that, in such a close case, anything the prosecutor said may have affected the jury's verdict, and asserts that the timing of the prosecutor's remarks, at the very beginning of cross-examination, gave his remarks greater impact.  Godfrey further notes that, although the trial lasted about eight hours, the jury spent close to sixteen hours in deliberations, sent out eleven written requests for trial and testimonial information, and asked the District Court how to know if a jury was deadlocked.  In response, the District Court issued seven special instructions to the jury, informed the jury that it would not take any more special requests for materials, and informed Godfrey and the State that it would declare a mistrial if the jury did not return a verdict by 4 p.m. on April 26, 2000.  Shortly before the deadline, the jury returned its verdict, acquitting Godfrey of Count One of sexual assault and Count Two of attempted sexual intercourse without consent, but finding him guilty of the alternative charge of sexual assault on Count Two.

¶27    Godfrey contends that the Acknowledgment of Rights form advised him of his right to remain silent, and therefore, the prosecutor could not thereafter comment on his silence. The State argues that the Acknowledgment of Rights form which Godfrey signed and reviewed with the District Court was not the equivalent of a *Miranda* warning (as set forth in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694).  Because Godfrey was never subjected to a custodial interrogation and was not read his *Miranda* rights by a police officer, the State--relying on Finley--asserts it never induced Godfrey to exercise his right to remain silent.  Thus, the State argues, it was not improper for the prosecutor to

comment upon Godfrey's silence, since he remained silent of his own choosing and not because of any inducement via an earlier *Miranda* warning.

¶28 Godfrey and the State each argue that *Finley* supports their position. Like Godfrey, Finley testified in his own defense, and gave an explanation of events which he had not volunteered prior to taking the stand. *Finley*, 276 Mont. at 131, 915 P.2d at 211. The prosecutor in *Finley*, like the prosecutor in Godfrey's case, cast aspersions upon the defendant's account by questioning his version of events given for the first time at trial. *Id.* As is also the case for Godfrey, Finley's counsel did not make a contemporaneous objection to either the prosecutor's cross-examination or to his closing comments. *Finley*, 276 Mont. at 131, 915 P.2d at 212. Ultimately, however, this Court held that, while it did not condone the prosecutor's comments, Finley's privilege against self-incrimination under the Fifth Amendment or Article II, Section 25 of the Montana Constitution was not violated, because the record did not reflect that he had ever been advised of his *Miranda* rights. *Finley*, 276 Mont. at 141, 915 P.2d at 218.

¶29 The State argues that in *Finley*, we specifically held that if the defendant does not receive a *Miranda* warning, there can be no *Doyle* error, as the defendant was not induced into remaining silent only to have that silence used against him at trial. The crux of the State's position here is that the Acknowledgment of Rights form--which Godfrey received from his attorney and which he then initialed and went over with the District Court during his initial appearance--was not the equivalent of a *Miranda* warning because Godfrey's rights were given to him on a printed form rather than read to him by a police officer at the time

12

of his arrest. The State argues that, because Godfrey signed the form prior to his appearance in the District Court, and because the *Miranda* warning was not read to him specifically by a police officer, *Doyle* does not apply. The State maintains that, while a trial judge is required under § 46-7-102, MCA, to advise a defendant of his Constitutional rights, this written warning's purpose is to fulfill the § 46-7-102, MCA, requirements, and does not serve the same purpose as a *Miranda* warning.

¶30   Godfrey replies that the State's insistence that *Doyle* and *Finley* apply only if a defendant is given a *Miranda* warning by a police officer is an unreasonably restrictive interpretation. Godfrey notes that the United States Supreme Court has held that it was a violation of due process to impeach a defendant based on his silence "at the time of arrest and after receiving *Miranda* warnings," *Doyle*, 426 U.S. at 619, 96 S. Ct. at 2245, but that the Court did not limit its holding to the time of arrest or only to warnings read to arrestees by police officers. Godfrey also points out that *Doyle* cites *Johnson v. United States* (1943), 318 U.S. 189, 63 S. Ct. 549, 87 L. Ed. 704, in which the Supreme Court held that a prosecutor could not use the silence of a defendant who had received a trial court judge's assurances of the Fifth Amendment right against self-incrimination as evidence of guilt. Godfrey notes that *Doyle's* progeny do not reference "law enforcement" or "police officers," but rather "government" or "governmental" assurances. *See Portuondo v. Agard* (2000), 529 U.S. 61, 74, 120 S. Ct. 1119, 1128, 146 L. Ed. 2d 47 (*Doyle* is a case where "the government had induced silence by implicitly assuring the defendant" that it would not be used against him); *Jenkins v. Anderson* (1980), 447 U.S. 231, 240, 100 S. Ct. 2124, 2130, 65 L. Ed. 2d

13

86 (no "governmental action" induced pre-arrest silence); *Anderson v. Charles* (1980), 447 U.S. 404, 408, 100 S. Ct. 2180, 2182, 65 L. Ed. 2d 222 (under *Doyle*, a defendant's silence after "governmental assurances" cannot be used against him).

¶31 We conclude that the State's position that it may comment on a defendant's post-arrest silence as evidence of guilt, as long as no *Miranda* warning was specifically read to the defendant by a police officer at the time of the defendant's arrest, is without merit. We see no reason to distinguish between the situation where a defendant is advised of his right to remain silent by a police officer at the time of arrest, and the situation in which a defendant is advised of his right to remain silent by a court. Whether a defendant is advised of his right to remain silent via the reading of a printed form or having such warning recited to him, and regardless of whether the provider of that information is a law enforcement officer or a trial judge, the defendant has been induced to exercise his right to remain silent by an agent of the State. Once a *Miranda* warning of any sort is given, it is error for a prosecutor to comment on a defendant's post-*Miranda* silence or his failure to offer a post-*Miranda* explanation of the alleged crime. Thus, we reject the State's contention that no *Doyle* error could possibly exist under the circumstances of this case.

¶32 However, since Godfrey did not object to the prosecutor's questions and comments at trial, we must decide whether we will review this claimed error under our common law plain error doctrine. Godfrey urges us to analyze the issue under the procedure set forth in *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735. The first step in this analysis is to determine whether the alleged error is properly characterized as "structural" error or

14

"trial" error. *Van Kirk*, ¶ 37. Godfrey concedes that the claimed errors would be "trial" error. *Van Kirk*, ¶ 40. The next step is to determine whether the error was harmless under the circumstances. *Van Kirk*, ¶ 41. Once error is established, the burden shifts to the State to prove that there is no reasonable possibility that the error contributed to the verdict. *Van Kirk*, ¶ 47. *Van Kirk* states in pertinent part,

> As a threshold matter, once a convicted person raises and establishes that the evidence in question was erroneously admitted and has alleged prejudice under the 'reasonable possibility' test, it then becomes incumbent on the State to demonstrate that the error at issue was not prejudicial.

*Van Kirk*, ¶ 42.

¶33    Godfrey pointed out in his briefs and during oral argument that the State has always insisted that no *Doyle* error occurred. He maintains that because the State has never conceded that there might have been error behind the conduct of the prosecutor, it cannot meet the *Van Kirk* requirement of demonstrating that the error at issue was not prejudicial. In other words, we cannot conduct a harmless error analysis because the State has failed to carry its burden under *Van Kirk*. While Godfrey makes a valid point, the fact remains that we must first invoke and apply the plain error doctrine before we can reach the question of whether the alleged error is harmless under a *Van Kirk* analysis.

¶34    We turn then to the question of whether this case calls for application of the plain error doctrine. First, Godfrey directs our attention to *State v. Furlong* (1984), 213 Mont. 251, 690 P.2d 986, and argues that it is factually similar and controls in his case. Godfrey notes the following exchange during the prosecutor's cross-examination of Furlong:

15

Q. Is this the first time you have told this story to anyone, Mr. Furlong?
A. Except what I have discussed with my lawyer.

Q. You didn't think to tell the Police, the investigator, the County Attorney this before?
A. Nobody ever came to me and asked me what happened.

Q. You are charged with a felony crime. Do you understand that?
A. Yes.

Q. You never thought about just mentioning that to somebody, did you?
A. Mentioning what?

Q. That you have no idea how the property got in your car, never crossed your mind to mention that to anybody?
A. What do you mean?

Q. When you were arrested by Sergeant Krakalia, you didn't just happen to mention, 'I don't know how that property got in there. I loaned my car to Johnny and he came back with it'?
A. I didn't say anything.

Q. But you are going to be arrested on a felony crime and you don't think to offer an explanation when you are a totally innocent victim?

At that point, Furlong's attorney objected to the line of questioning and was overruled. *Furlong*, 213 Mont. at 256-257, 690 P.2d at 989. On appeal, this Court found that the trial court erred when it overruled Furlong's objection, and concluded that the prosecutor's cross-examination denied Furlong's Constitutional right to due process. *Furlong*, 213 Mont. at 258, 690 P.2d at 989. Godfrey argues that the only substantive difference between the prosecutorial misconduct in this case and in *Furlong*, is that Furlong's attorney objected to the prosecutor's questions while his attorney did not. The errors, he alleges, are identical.

16

¶35    Godfrey claims that his failure to object at trial should not prevent him from seeking relief under the doctrine of plain error, and directs our attention to similarities between his case and *State v. Sullivan* (1996), 280 Mont. 25, 927 P.2d 1033.  The prosecutor in *Sullivan* mentioned during his opening and closing statements, and during the questioning of witnesses, that Sullivan refused to make a statement at the time of arrest, characterizing Sullivan's initial silence as providing him with time to make up an explanation.  *Sullivan*, 280 Mont. at 29-30, 927 P.2d at 1036.  Godfrey notes that, like his counsel, Sullivan's counsel did not object to these remarks, and that in *Sullivan*, we invoked the common law plain error doctrine, and held that Sullivan's Constitutional right to due process had been violated.  *Sullivan*, 280 Mont. at 33, 927 P.2d at 1038.

¶36    We discretionarily review claimed errors that implicate a criminal defendant's fundamental Constitutional rights, even if no contemporaneous objection is made, where failing to do so may result in a manifest miscarriage of justice, may leave unsettled the question of fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process.  *Finley*, 276 Mont. at 137, 915 P.2d at 215.  While we have invoked the common law plain error doctrine in a case similar to Godfrey's, we conclude that this case does not compel its application.

¶37    The prosecutor's cross-examination questions were inadvisable.  However, and significantly, they were more a comment on Godfrey's *story* than on his *silence*.  See *supra*, ¶ 18.  Moreover, the prosecutor's comment in closing, while again inadvisable, focuses upon the veracity of Godfrey's story, and does not at all reference his earlier silence.  Unlike in

17

*Furlong* and *Sullivan*, the prosecutor here did not comment upon the fact that Godfrey had failed earlier to volunteer his version of events to the police.

¶38     A fundamental aspect of "plain error," is that the alleged error indeed must be "plain." In a case such as this, it should leave one firmly convinced, as we were in *Sullivan*, that the prosecutor's comments created an inference for the jury that by remaining silent after receiving his rights, the defendant must be guilty of the alleged crime. *Sullivan*, 280 Mont. at 36, 927 P.2d at 1040. What occurred here leads to no such firm conviction.

¶39     In *Finley*, we stated,

> Whatever name a court chooses to use for the doctrine, courts invoke plain error review to correct error not objected to at trial but that affects the fairness, integrity, and public reputation of judicial proceedings. The particular facts and circumstances of each case drive the applicability of the plain error doctrine.

*Finley*, 276 Mont. at 134, 915 P.2d at 213 (citation omitted). We noted further that we would exercise our discretion in determining when and where to apply such doctrine.

> [G]iven the legislature's obvious intention to restrict the use of plain error review by its enactment of § 46-20-701(2), MCA, we will henceforth use our inherent power of common law plain error review sparingly, on a case-by-case basis, and we will invoke that doctrine only in the class of cases aforementioned. In so doing, we reemphasize the necessity for contemporaneous objections to claimed error, and we caution counsel that, except in the class of cases mentioned, the provisions of § 46-20-701, MCA, will be applied in the absence of contemporaneous objection.

*Finley*, 276 Mont. at 138, 915 P.2d at 215.

¶40     We conclude that the particular facts of this case do not compel the application of the plain error doctrine because there simply was no clear comment on or infringement of

18

Godfrey's fundamental right to remain silent. Accordingly, and because there was no contemporaneous objection by Godfrey's counsel to the prosecutor's questions or comments, we affirm Godfrey's conviction.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER

Justice Jim Rice specially concurring.

¶41    I concur in the decision of the Court to affirm, but under a different rationale.

¶42    There was no *Doyle* error here for two reasons. First, as the Court concludes, "there simply was no clear comment on or infringement of Godfrey's fundamental right to remain silent." *See* ¶ 40. Without an improper comment on Godfrey's silence, it is unnecessary to determine whether the State induced the silence under *Doyle* and *Finley*.

¶43    Secondly, the prosecution's comments were, in any event, appropriately made in response to Godfrey's assertion, as part of his innocence defense, that he had cooperated with police from the beginning, a theme offered during defense counsel's cross-examination of Officer Potter, during Godfrey's direct testimony and during defense counsel's closing argument. We said in *Finley*, "[the defendant] voluntarily chose to take the stand, and as such, his credibility was subject to impeachment just like any other witness." *Finley*, 276 Mont. at 141, 915 P.2d at 218. Here, Godfrey took the stand and the credibility of his assertion that he cooperated with police was properly subject to challenge, including his failure to share his trial story with police during the course of his "cooperation" with them.

/S/ JIM RICE

Chief Justice Karla M. Gray and District Judge Ed McLean, sitting in place of Justice John Warner, join in the concurring opinion of Justice Rice.

/S/ KARLA M. GRAY

/S/ ED McLEAN
Honorable Ed McLean, District Judge

20