DA 08-0495

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 256

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

CHRISTOPHER WILLIAM WAGNER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-07-97C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Jim Wheelis, Chief Appellate Defender; Koan Mercer, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

           Hon. Steve Bullock, Montana Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

           Marty Lambert, Gallatin County Attorney; Todd Whipple, Deputy County
Attorney, Bozeman, Montana

Submitted on Briefs: June 9, 2009

Decided: August 4, 2009

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Christopher William Wagner (Wagner) appeals from a jury verdict, judgment and sentence of the Eighteenth Judicial District Court, Gallatin County, convicting him of attempted deliberate homicide with a weapon. We reverse and remand for a new trial.

¶2     The sole issue on appeal is whether the prosecutor's repeated comments at trial regarding statements Wagner made after invoking his *Miranda* rights created an inference of guilt that constituted plain error.

## BACKGROUND

¶3     This case arises from a gun fight in which Wagner and Michael Peters (Peters) shot each other. Peters dated Melody Lark (Lark) from 1996 through 2000 in Bozeman, and they remained friends afterwards. Lark dated Wagner in Colorado for about four months in the summer of 2004, and then after travelling for a few months, she lived with Wagner for about five months. The relationship deteriorated while they lived together. Lark began to fear Wagner because he was often angry, paranoid, under the influence of methamphetamine, shot guns around his property, and discussed harming himself or others. Eventually Lark ended the relationship and moved out.

¶4     Lark testified that Wagner assaulted her the evening of October 8, 2005, after their relationship had ended. Wagner approached her from behind and knocked her out. She woke up outside with her head and ears bleeding. She went inside, but Wagner was there and took her phones away when she tried to call for help. Wagner eventually agreed to take her to a friend's house. Lark was later diagnosed with a skull fracture and traumatic

2

brain injury. The doctor reported that her head injury was caused by an instrument hitting her head three or more times. Peters flew to Denver to visit Lark in the hospital following the assault.

¶5 The State of Colorado filed felony assault charges against Wagner. While the charges were pending, Wagner was released on bail with a GPS tracker around his ankle. Wagner removed the GPS tracker and fled Colorado.

¶6 Wagner came to Montana where he went by the name Curt Warren (and other aliases) and told people that his pregnant wife had died in a car accident. In early January 2007, Wagner hired a private investigator to find Peters' address. The investigator provided three addresses in Bozeman. About January 11, 2007, Wagner went looking for Peters at his home. Peters' father, John, answered the door and told Wagner that Peters was not home. Wagner told John to tell Peters that his friend, Jim, was passing through town. When John asked where he was from, Wagner hesitated before replying Kalispell. John thought that it was unusual that the man, who looked like a vagrant, had walked to his house on a very cold day. Later John recounted the incident to Peters, who did not know a Jim from Kalispell. Peters became concerned that the visitor was Wagner. Peters was afraid due to Wagner's attack on Lark and a previous assault when Wagner had beaten and stabbed an ex-girlfriend's boyfriend. Peters renewed his concealed weapons permit and asked Lark to email him a picture of Wagner. Peters' father could not positively confirm from the picture whether the man who had visited was Wagner.

¶7 On January 17, 2007, Peters left his house around noon. As he started to drive away in his truck, Peters noticed a person walking down the street towards him. The man

flagged Peters down and he rolled down the window to talk. The man asked Peters if he had seen a little white dog, but then pulled a gun on him. Peters figured that the man must be Wagner, whom he viewed as a "deadly person" intending to kill or torture him. Wagner ordered Peters to scoot over. Peters began to do so, but when Wagner grabbed the door handle, Peters shot at him. Peters fired two shots, which hit Wagner in the chest, before his gun jammed. Wagner then fired at Peters, hitting him three times: grazing his cheek, piercing his abdomen, and puncturing his hand. Peters escaped out the passenger door and ran into his house. His father called 911, but Wagner had fled by the time the police arrived. Peters willingly told the police what occurred.

¶8 At trial, Wagner provided a different version of events. Wagner claims he sought Peters in order to help him reconnect with Lark. Wagner testified that he returned to Peters' house to find out whether the older man he had spoken with before could give him any information on how to contact Peters. As he approached the house, Wagner noticed a truck back out of the driveway and drive towards him. Wagner claimed he gave a little wave to the driver and the truck stopped. According to Wagner, the driver then pointed a gun out the window and fired two shots at him. Wagner testified that when he shot back he was attempting to shoot the gun out of Peters' hand.

¶9 Although Wagner had been shot twice, he was able to walk away from the scene. Later Wagner asked a stranger for a ride. Wagner told the man that he had injured himself falling on the ice. Wagner got a ride to the Filling Station and then walked to a storage unit he had rented nearby. From there, Wagner called a friend who agreed to pick him up. Wagner told his friend that he had been stabbed in a bar that morning. Wagner

4

tended to his wounds at his friend's apartment and then called another friend to pick him up. Wagner stayed with his friend in Ennis for a few days, then got a ride to Greybull, Wyoming, where he stayed with another acquaintance. Wagner was arrested in Greybull a few days later on January 25, 2007.

¶10 Detectives Cindy Crawford and Tom Pallach of the Gallatin County Sheriff's Office travelled to Greybull to interview Wagner as part of their investigation of the shooting. The detectives met with Wagner on January 26, 2007. After advising Wagner of his *Miranda* rights, Wagner indicated that he wanted to speak to a lawyer, saying that he didn't want to dig himself a deeper hole.

¶11 The prosecutor referenced this comment four times at Wagner's trial in May 2008. In his opening statement, the prosecutor said, "On January 26th, 2007, upon being interviewed by the police detectives, and asked whether he'd like to make a comment, he simply says, I don't want to dig myself a deeper hole." Then during the State's case-in-chief, the prosecutor asked Detective Crawford on direct examination whether Wagner made any statements or admissions after being advised of his *Miranda* rights. Crawford replied, "Mr. Wagner stated something to the effect where he wanted to speak to an attorney first and he said, don't want to dig myself a deeper hole." Later the prosecutor ended his cross-examination of Wagner by questioning him regarding the statement:

> Q. Okay. When you were arrested, you told the Detectives that you didn't want to talk to 'em and dig yourself a deeper hole, right?
> A. Yes.
> Q. And today you explained that as nothing I was going to say was going to help you.
> A. Yeah, there was no point of saying anything.
> Q. No point in telling the story back in January of 2007?

5

A. It wasn't going to help change anything.
Q. So, 17 months, or 16 months later, this is when you tell this story today?
A. Yes.

Finally, in his closing argument, the prosecutor stated:

> Somebody was right and somebody was wrong. So you have to choose who you believe. Do you believe Michael Peters who, from the very beginning, said, yeah, I shot this guy. I shot him first, and here's why. Or, do you believe the Defendant, who doesn't want to dig himself a deeper hole.

Wagner's counsel did not object to these repeated prosecutorial comments.

## STANDARD OF REVIEW

¶12 This Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection was made, "where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *State v. Godfrey*, 2004 MT 197, ¶ 22, 322 Mont. 254, 95 P.3d 166 (citing *State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996), *overruled on other grounds by State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817). We use our inherent power of common law plain error review sparingly. *Godfrey*, ¶ 22.

## DISCUSSION

¶13 *Whether the prosecutor's repeated comments at trial regarding statements Wagner made after invoking his* Miranda *rights created an inference of guilt that constituted plain error.*

6

¶14  Since Wagner did not object to the prosecutor's repeated comments at trial, our review requires application of the common law plain error doctrine. Wagner argues that the prosecutor's comments "leave unsettled the fundamental fairness of the trial" by impermissibly using Wagner's invocation of *Miranda* rights against him to attack his credibility and create an inference of guilt. Thus, Wagner claims that the State's repeated and deliberate use of his invocation of the right to silence warrants reversal under plain error review. We agree.

¶15  The United States Constitution's privilege against self-incrimination and right to due process prohibit the State from using a defendant's invocation of *Miranda* rights against him at trial. U.S. Const. amends. V, XIV. The United States Supreme Court described the privilege against self-incrimination as "the hallmark of our democracy," explaining that:

> the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will."

*Miranda v. Arizona*, 384 U.S. 436, 460, 86 S. Ct. 1602, 1620 (1966) (internal citations omitted). The Supreme Court required procedural safeguards, in the form of *Miranda* warnings, to protect these constitutional rights from the inherent coercion of custodial interrogation.

7

> We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624.

¶16 The Supreme Court held in *Doyle v. Ohio* that a prosecutor's impeachment use of a defendant's silence after receiving *Miranda* warnings was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him that his silence will not be used against him. 426 U.S. 610, 618-19, 96 S. Ct. 2240, 2245 (1976). The Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619, 96 S. Ct. at 2245. Underlying *Doyle* is the principle that *Miranda* warnings contain an implicit assurance that exercising *Miranda* rights will carry no penalty and that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618, 96 S. Ct. at 2245.

¶17 This Court has held that *Doyle* error implicates fundamental constitutional rights that can warrant plain error review. *Godfrey*, ¶ 24; *State v. Sullivan*, 280 Mont. 25, 32-33, 927 P.2d 1033, 1038 (1996); *Finley*, 276 Mont. at 138, 915 P.2d at 216. In the context of *Doyle* error, reversal under plain error review is appropriate when the Court is

8

firmly convinced that the "prosecutor's comments created an inference for the jury that by remaining silent after receiving his rights, the defendant must be guilty of the alleged crime." *Godfrey*, ¶ 38; *see also Sullivan*, 280 Mont. at 36-37, 927 P.2d at 1040.

¶18     In *State v. Sullivan*, this Court held that the prosecutor committed *Doyle* error when he commented on Sullivan's post-*Miranda* silence during the State's opening statement, case-in-chief, and closing argument. 280 Mont. at 35, 927 P.2d at 1039.

> We conclude that the four separate comments made in the State's opening statement, during the testimony of Detective Shaw, and during the State's closing argument regarding Sullivan's post-*Miranda* silence were not harmless beyond a reasonable doubt. These comments and testimony that Sullivan declined to give a statement to law enforcement officers after being advised of his *Miranda* rights violated Sullivan's right to due process. By making these comments, the State created an inference for the jury that, by remaining silent after having been read his rights, Sullivan was guilty of deliberate homicide.

*Sullivan*, 280 Mont. at 36, 927 P.2d at 1039-40. The Court reversed based on this plain error. The facts here are similar to those in *Sullivan*. As in *Sullivan*, the prosecutor here used Wagner's post-*Miranda* silence in all phases of the trial: during his opening statement, his case-in-chief, his cross-examination of Wagner, and his closing argument.

¶19     Wagner invoked his *Miranda* rights when he requested to speak with an attorney. Detective Crawford testified that she was present when "Detective Palash [sic] read him his rights per Miranda, and Mr. Wagner stated something to the effect where he wanted to speak to an attorney first and he said, don't want to dig myself a deeper hole." This was an effective invocation of Wagner's *Miranda* rights. The United States Supreme Court has explained, "[w]ith respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain

silent, as well as of a desire to remain silent until an attorney has been consulted." *Wainwright v. Greenfield*, 474 U.S. 284, 295 n. 13, 106 S. Ct. 634, 640 n. 13 (1986). In *Doyle*, the Supreme Court understood "silence" to include the defendant's response of "[w]hat's this all about?" *Doyle*, 426 U.S. at 614 n. 5, 96 S. Ct. at 2243 n. 5. Thus, Wagner's request to speak with an attorney and his comment that he didn't want to dig himself a deeper hole is a sufficient invocation of his right to remain silent.

¶20 The prosecutor used Wagner's post-*Miranda* silence to create an inference of guilt. The prosecutor relied on Wagner's failure to tell his version of events until trial as evidence of his guilt. On cross-examination, the prosecutor asked Wagner about his initial interview with the police:

> Q. No point in telling the story back in January of 2007?
> A. It wasn't going to help change anything.
> Q. So, 17 months, or 16 months later, this is when you tell this story today?
> A. Yes.

Clearly the prosecutor was overreaching. His questions were designed to create an inference that, by declining to give his version of events after invoking his *Miranda* rights, Wagner must be guilty. Further, the prosecutor implied that Wagner's post-*Miranda* statement that he didn't want to dig a deeper hole was an admission of guilt. The prosecutor ended his cross-examination of Wagner by enumerating the multiple lies that Wagner told people in his search for Peters and after the shooting. The prosecutor elicited at least 21 acknowledged lies told by Wagner. This line of questioning was sufficient to undermine Wagner's credibility in front of the jury. However, the

prosecutor went too far by impermissibly implying that Wagner's failure to tell his story earlier or his comment about digging a deeper hole was evidence of his guilt.

¶21 This inference of guilt caused actual prejudice to Wagner constituting plain error.

> A fundamental aspect of "plain error," is that the alleged error indeed must be "plain." In a case such as this, it should leave one firmly convinced, as we were in *Sullivan*, that the prosecutor's comments created an inference for the jury that by remaining silent after receiving his rights, the defendant must be guilty of the alleged crime.

*Godfrey*, ¶ 38. Thus, we hold that the prosecutor's conduct raises questions regarding the fundamental fairness of the trial by violating Wagner's constitutional right to due process and privilege against self-incrimination.

¶22 Reversed and remanded for a new trial consistent with this opinion.


/S/ MIKE McGRATH

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS


Justice Jim Rice, dissenting.

¶23 We exercise plain error review "when failure to do so may result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *State v. Lacey*, 2009 MT 62, ¶ 74, 349 Mont. 371, 204 P.3d 1192 (citation omitted). I do not believe these reasons exist here.

11

¶24 I would affirm on the basis of the case explanation given by the Court in ¶¶ 3-9. The Court cannot even explain the facts of this case without exposing Wagner's ludicrous tale of lies, such as his telling a friend after the shooting incident that "he had been stabbed in a bar that morning." *Opinion*, ¶ 9. The jury did not believe, and no jury would, Wagner's claim that, while on the run from the law, he loaded a gun and went to Peters' house simply "to find out whether the older man he had spoken with before could give him any information on how to contact Peters," particularly given Wagner's history of sadistic and vengeful violence toward his victims. *Opinion*, ¶ 8.

¶25 Wagner sat by idly and failed to object while the prosecutor made multiple references to the comment he now challenges. Had he brought the issue to the District Court's attention by making a single objection, the court could have sustained the objection and instructed the jury about the comment. Wagner now gets the benefit of his own inaction, perhaps a strategy he purposefully employed. Regardless, a new trial should not be his reward in light of the overwhelming evidence against him. No "miscarriage of justice" occurred here for which plain error review is necessary. While victims must sometimes be inconvenienced by a re-trial so that the integrity of the judicial process can be preserved, the only "miscarriage of justice" in this case is putting the victims through the trauma of a second showing of Wagner's utterly unbelievable assertions.

¶26 I would not grant plain error review, and would affirm.

/S/ JIM RICE