FILED

11/29/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0071

DA 14-0071

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 308

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

ROBERT PIERCE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Anaconda-Deer Lodge, Cause No. DC-12-29
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Chief Appellate Defender, Eileen A. Larkin, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

            Ben Krakowka, Anaconda-Deer Lodge County Attorney, Dan Guzynski, Mary E. Cochenour, Special Deputy County Attorneys, Helena, Montana

                  Submitted on Briefs:  September 21, 2016

                         Decided:  November 29, 2016

Filed:

                        _____
                                Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    Robert Pierce appeals from the order entered in the Third Judicial District Court, Anaconda-Deer Lodge County, denying his motions for discovery sanctions and for mistrial. Pierce was convicted by a jury of sexual intercourse without consent and sexual assault involving his step-granddaughter, M.R., who was age nine and eleven at the time of the offenses. We affirm.

¶2    Pierce presents the following issues for review:

> *1. Whether the District Court abused its discretion when it denied Pierce's request for continuance.*
>
> *2. Whether the District Court abused its discretion when it denied Pierce's motion for mistrial.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    M.R.'s father died prior to her birth in 1998 and M.R. was raised by her mother Malissa (Mother). M.R.'s paternal grandmother (Grandmother) and Grandmother's husband (Pierce) assisted Mother with raising M.R and her siblings. M.R. frequently spent weekends and holidays with Pierce and Grandmother; camped together; hunted together; and did many family activities together.

¶4    On February 5, 2012, when M.R. was fourteen, Mother had a Super Bowl party that Grandmother and Pierce attended. Mother noticed that M.R. was distant and cross towards her. M.R. was on the phone with her boyfriend during the party and was told by her boyfriend that she was a "prude." The accusation prompted M.R. to respond to her boyfriend that she had been touched by Pierce. Following this disclosure, M.R.'s boyfriend insisted that M.R. tell her mother or, alternatively, that he would tell M.R.'s

2

mother the next day. After everyone left the party, M.R. told Mother about Pierce's abuse.

¶5 M.R. disclosed to Mother that Pierce first touched her when she was in the third grade while M.R. was visiting at Grandmother's home. M.R. was alone playing video games when Pierce sat down next to her. Pierce unbuttoned M.R.'s pants, held her down with one hand, slipped his other hand down her pants, and put his fingers inside of her. When M.R. struggled, Pierce held her down and covered her mouth when she tried to scream for Grandmother. Pierce told M.R. not to tell anybody because he would get into a lot of trouble. M.R. described that "it hurt really bad" when Pierce touched her vagina, and she had trouble urinating later "because it burned so bad." M.R. could feel Pierce's penis touching her leg through his pants. Afterwards, M.R. ran downstairs and sat with Grandmother, but M.R. did not tell Grandmother what Pierce had done.

¶6 M.R. also disclosed to Mother two other incidents when Pierce abused her. These incidents occurred when the family was traveling. Once, in a Missoula hotel, M.R. was sleeping in bed with Grandmother and Pierce. Grandmother was facing away from M.R. and Pierce began to suck on M.R.'s breasts. M.R. responded by moving to the other side of Grandmother in the bed. The second time was at a hotel in Kalispell. While in bed with Grandmother and Pierce, Pierce touched M.R.'s breasts and placed her hand on his penis. M.R. again moved, but this time M.R. got into a different bed with her brother.

¶7 Following these disclosures, Mother testified M.R. sat in her arms and they both held each other and cried through the night. That morning, Mother called her friend, Assistant Chief of Police of Anaconda, Bill Sather (Sather), asking for guidance. Mother

testified she "had no idea what to do, and [she] knew he would have some options." Sather informed Mother that he was a mandatory reporter and advised Mother to tell Grandmother of M.R.'s disclosures.

¶8 After speaking with Sather, Mother called her family counselor, Heidi Matlack-Larson (Matlack-Larson), who similarly informed Mother that she was a mandatory reporter. Matlack-Larson advised Mother to tell Grandmother of M.R.'s disclosures. Pierce was in Las Vegas at the time so Mother went over to Grandmother's home and told her what M.R. had said. Both agreed that they should confront Pierce together, but were unable to reach him on the phone. Later, after Mother had left Grandmother's home, Grandmother spoke to Pierce and told Pierce of M.R.'s disclosures. Grandmother's conversation with Pierce occurred before Mother or M.R. had confronted Pierce about M.R.'s disclosures.

¶9 After Mother learned of Grandmother's conversation with Pierce, Mother called Pierce herself. Pierce said that M.R. was lying and had made up her story because of peer pressure; specifically, that M.R.'s friends were talking about being molested or M.R.'s boyfriend set M.R. up to tell the story. Pierce was calm while talking to Mother and not angry. Mother explained to Pierce that if he admitted to M.R.'s allegations the family would get him help; but if he continued to deny M.R.'s allegations and "make my daughter out to be a liar, you will be prosecuted." When Pierce learned that Mother had contacted Sather he became very angry. The phone call ended when Mother lost reception.

4

¶10 M.R. became angry when she learned from Mother that Pierce had said she was lying. Mother and M.R. decided to call Pierce. When Pierce answered, M.R. did not tell him that Mother was also listening in on the phone call. M.R. asked Pierce why he was lying and would not just admit to what he had done to her. Pierce asked M.R. why she was bringing this up now and to whom M.R. had made her disclosures. Pierce told M.R. that this could ruin his career and it was killing Grandmother. Pierce suggested that maybe it was M.R. who had touched him, that he would turn the story around and tell people she had touched him, and that her life would be horrible if she continued to insist her story was true. Pierce threatened M.R. that he was in a tall building and that he might jump from the window. M.R. told Pierce he had a choice to admit that he did this to her, in which case they would get him help and the matter would end. Pierce insisted he did not abuse her. At this point, Mother took the phone from M.R. and accused Pierce of being a pervert, that he was going to die, that he would be prosecuted, and that she was calling the police. Mother hung up the phone. Pierce called back and said he would not admit to anything and "I sign [Sather's] paychecks." Mother then yelled at Pierce again and hung up. Soon afterwards, Sather picked up Mother and M.R. and took them to the police station where they provided written statements.

¶11 Sather initiated an investigation of Pierce. However, the case was quickly transferred to the Division of Criminal Investigation (DCI) due to Pierce's position as Deer Lodge County Commissioner. DCI Agent Phil Matteson (Agent Matteson) was assigned to the case and made a physical copy of the County's law enforcement file. The Anaconda-Deer Lodge County Department of Law Enforcement (A-DLCDLE) uses a

computer system named "Swift" to store investigative reports. After the investigation had begun, Sather produced a report (Sather Report) which was not included in the Swift program and apparently was also not contained within the physical file that Agent Matteson copied. Agent Matteson subsequently retired and the case was taken over by DCI Agent Sullivan. Agent Sullivan first discovered the Sather Report on April 16, 2013, just a few days before the scheduled trial date of April 22, 2013, when he went to retrieve a better copy of a different document from A-DLCDLE. Neither Agent Sullivan nor either party's counsel had seen the Sather Report prior to April 16, 2013. Upon learning of the Sather Report, the State immediately filed a Notice of Compliance and provided a copy of the Sather Report to the defense.

¶12 In response to disclosure of the Sather Report, Pierce filed a motion for sanctions and requested additional time to locate and interview witnesses identified in the document.[1] The District Court held a hearing on April 18, 2013, during which Agent Sullivan explained the contents of the Sather Report and discussed whether the substance of the information contained within the Sather report had already been provided to the defense. The Sather Report was admitted into evidence. The State could not explain why the Sather Report was not in the Swift program, why it was not part of the original copy of the Swift file, or how it subsequently was placed into the Swift file where Agent Sullivan discovered it. However, Agent Sullivan testified the only new information not previously disclosed to Pierce were alleged comments made by Chief Executive Officer

---

[1] In the District Court, Pierce also asked for time to investigate the identity of persons in photos that the State had recently provided during discovery. Pierce does not raise any issues regarding these photos on appeal.

6

of Anaconda, Becky Guay (Guay), that Pierce was the "real victim" and that people presumed Pierce was "guilty until proven innocent." Agent Sullivan testified that the information did not suggest that Guay had any personal knowledge about the case, and that it appeared her statements were merely her personal belief. Relying on *State v. Golder*, 2000 MT 239, 301 Mont. 368, 9 P.3d 635, the court held that the record did not support Pierce's claim of undue surprise or prejudice and the court, accordingly, denied Pierce's motion for sanctions. Pierce's jury trial began on April 22, 2013.

¶13 During opening statements the State described the struggles M.R. had coming forward with her disclosures and how it similarly would be difficult for M.R. to continue to speak of her abuse at trial. The State explained that Mother wanted to keep M.R.'s disclosures within the family and that Mother told Pierce if he would admit to her and M.R. that he had committed the offenses the matter would be kept within the family. Pierce did not object at any time during the State's opening statement.

¶14 The following morning Pierce moved for a mistrial. Pierce alleged the State's opening statement improperly sought sympathy for M.R. and that the State sought to "comment, imply or otherwise impress upon the jury that the Defendant is somehow committing another crime, or further victimizing M.R. by not confessing when confronted by M.R. and her mother [ ] and by exercising his right to a trial." The State argued that it permissibly summarized what actually happened and the evidence that would be presented. The State denied having suggested that Pierce should be punished for invoking his right to trial. The District Court denied Pierce's motion for mistrial,

concluding the State had not acted improperly and had not commented on Pierce's invocation of a constitutional right.

¶15    Pierce appeals the District Court's denial of his motion for discovery sanctions, specifically the denial of a continuance, and Pierce's motion for mistrial.

## STANDARDS OF REVIEW

¶16    We review a court's imposition of sanctions and the admission of the material in controversy for an abuse of discretion. *See Golder*, ¶ 7. When reviewing a district court's ruling on a motion for a continuance, we apply an abuse of discretion standard as well. *State v. Toulouse*, 2005 MT 166, ¶ 14, 327 Mont. 467, 115 P.3d 197. When a district court acts arbitrarily, without conscientious judgment or exceeds the bounds of reason it has abused its discretion. *State v. Hernandez*, 2009 MT 341, ¶ 7, 353 Mont. 111, 220 P.3d 25. A "district court cannot be overturned on appeal in absence of a showing of prejudice to the movant." *State v. Klemann*, 194 Mont. 117, 120, 634 P.2d 632, 634, (1981).

¶17    We similarly review a district court's denial of a motion for a mistrial for abuse of discretion. *State v. Moree*, 2010 MT 148, ¶ 11, 357 Mont. 24, 235 P.3d 585. We apply a deferential standard to the district court because the trial judge is in the best position to make the determination. *Moree*, ¶¶ 11, 18.

8

**DISCUSSION**

¶18    *1.    Whether the District Court abused its discretion when it denied Pierce's request for continuance.*

¶19    Pursuant to § 46-15-322(1)(a) and (c), MCA, the prosecution is required to provide a defendant with "the names, addresses, and statements of all persons whom the prosecutor may call as witnesses in the case in chief" and "all written reports or statements of experts who have personally examined the defendant or any evidence in the particular case . . . ." Failure to comply with discovery requirements subjects the prosecution to the possible imposition of sanctions pursuant to § 46-15-329, MCA. Relevant to Pierce's request for a continuance, a "court *may* impose any sanction that it finds just under the circumstances, including but not limited to: . . . (2) granting a continuance . . . ." Section 46-15-329(2), MCA (emphasis added).

¶20    We have continuously recognized that the statutory language "may" in § 46-15-329, MCA, grants the court discretion regarding imposition of sanctions where there has been a failure to comply with a discovery order. *Golder*, ¶ 11. Such discretion allows the court to consider the reason why disclosure was not made, whether noncompliance was willful, the amount of prejudice to the opposing party, and any other relevant circumstances. *Golder*, ¶ 11, citing *State v. Waters*, 228 Mont. 490, 495, 743 P.2d 617, 621 (1987).

¶21    Here, the court noted that it was undisputed that the materials were immediately disclosed to the defense when DCI and the prosecution became aware of them. Further, the evidence presented by the State established that while the Sather Report had not been

9

disclosed prior to April 16, 2013, the information included in the Sather Report, with the exception of one item, had previously been made available to Pierce in a timely manner. The only portion of the Sather Report not previously disclosed were the comments made by Guay. Pierce does not allege how Guay's comments surprised or unfairly prejudiced him, particularly since the comments did not involve new evidence or investigation about the case and appeared only to express Guay's opinion or sympathy for Pierce. Furthermore, Pierce has failed to show how his inability to contact Guay has harmed his defense. There was no indication in the Sather Report that Guay might have had personal knowledge or aided the defense in any way.

¶22 Based upon the foregoing, we conclude the District Court did not abuse its discretion when it denied Pierce's request for a sanction, in the form of a continuance, because the State's failure to disclose the Sather Report was not willful and Pierce has failed to demonstrate prejudice or surprise. Significantly, the substance of Guay's statements did not derive from first-hand knowledge and appeared to be merely Guay's opinion.

¶23 *2. Whether the District Court abused its discretion when it denied Defendant's motion for mistrial.[2]*

¶24 When determining whether to grant or deny a motion for mistrial the trial court will look to whether a defendant has been denied a fair and impartial trial. *State v.*

---

[2] The State argues that Pierce waived any objection to the prosecution's opening statement because he did not raise a contemporaneous objection. Here, conversely, the State responded substantively in chambers to Pierce's motion for mistrial which included discussion of the State's opening statement. The State may not change its theory on appeal. *State v. Anderson*, 1999 MT 60, ¶ 25, 293 Mont. 490, 977 P.2d 983 (citation omitted). Accordingly, this Court will not entertain the State's waiver argument on appeal.

*Bollman*, 2012 MT 49, ¶ 33, 364 Mont. 265, 272 P.3d 650. We apply a two-step process when determining if the defendant has been denied a fair and impartial jury trial. *State v. Lindberg*, 2008 MT 389, ¶ 25, 347 Mont. 76, 196 P.3d 1252. First, we consider whether the prosecutor's comments were improper. *Lindberg*, ¶ 25. Next, we look to whether the improper comments prejudiced the defendant's right to a fair trial. *Lindberg*, ¶ 25.

¶25 Pierce contends that the State made three improper comments or suggestions during opening statements: (1) the State misinformed the jury that the matter would have been kept in the family if Pierce admitted to M.R.'s allegations, (2) the State impermissibly burdened Pierce's right to a jury trial by commenting that the jury trial was a result of his denial of M.R.'s allegations, and (3) the State was attempting to invoke sympathy for M.R. based on Pierce exercising his right to a jury trial.

¶26 Mother and M.R. testified that they wished to keep the matter within the family and to get Pierce help for his problems. Significantly, the State did not produce testimony that the State *would* have kept the incident within the family had Pierce not invoked his right to jury trial. The State appropriately allowed Mother and M.R. to testify it was their *hope* that the matter could be kept within the family. Mother's testimony also explained why she delayed acting and reporting following M.R.'s disclosures and further explained the confrontation on the phone with Pierce in the presence of M.R. A consistent theme of the defense was to portray M.R. as lying about the allegations because of peer pressure and to avoid being considered a "prude" by her boyfriend. The testimony from M.R. and Mother refuted this attack on M.R.'s credibility by demonstrating M.R. was motivated to avoid exposure of the incidents and further

11

disclosures to the police, in addition to being required to potentially expose the matter to a jury. Pierce had the opportunity to cross-examine Mother and M.R. regarding the truthfulness of their statements and to attempt to undermine each's credibility. The record establishes the State's comments during opening statement were borne out by the evidence through the testimony of Mother and M.R.; that is, they both testified they wanted to avoid trial and to keep the matter within the family. The State was entitled to present this evidence as facts relevant to the presentation of its case and it was permissible for the State to provide an opening statement to the jury outlining the evidence it intended to present.

¶27 Pierce does not cite any specific failure of proof regarding the prosecution's opening statement. While Pierce maintains that Mother could not have intended to "keep the matter within the family" because she had already alerted two mandatory reporters to the allegations, Mother testified at trial that she did not know at the time she spoke to Sather and Matlack-Larson what a mandatory reporter was. The prosecution's statements about the consequences M.R. suffered as a result of making the allegations were supported by the evidence, to which Pierce did not object when the testimony was being produced. We conclude that Pierce has failed to meet his burden under the first prong of *Lindberg*—that the prosecution's statements were improper—and for this reason the District Court did not abuse its discretion in denying Pierce's motion for mistrial.

¶28 We feel one final matter cannot be ignored. This Court is obliged to review the entirety of the record and, upon doing so here, we were confronted with the following statement delivered by Pierce's defense counsel during closing argument, "And for you

12

men, I know if you've ever tried to undress a woman, if she's fighting you, you can't get that done . . . ." While contained within closing argument and not prejudicial to Pierce's defense, this statement nonetheless warrants attention. Not only does such a statement minimize sexual assaults, but it assumes men sitting on the jury have similarly committed sexual assaults. We can appreciate the position of the prosecution and the trial judge deciding not to object or comment on the inappropriateness of such a statement in front of the jury in the interest of avoiding a mistrial. However, we are not so constrained and will not allow the silence to be perpetuated and the statement to escape criticism. The trial judge and opposing counsel should never be placed in such a compromising position. Neither should a jury, who are unable to object or otherwise protest, be forced to suffer such an inappropriate suggestion. Dedicated representation does not include making statements minimizing sexual assaults or assuming male jurors have similarly committed sexual and criminal offenses. Nonetheless, we give defense counsel the gift of doubt that, at best, such a statement was carelessly uttered.

**CONCLUSION**

¶29 The District Court did not abuse its discretion in denying Pierce's request for a discovery sanction in the form of a continuance. The District Court similarly did not abuse its discretion in denying Pierce's motion for mistrial.

¶30 Affirmed.

/S/ LAURIE McKINNON

13

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE