FILED

07/23/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0517

DA 21-0517

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 152

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

SHANE CLARK JOHNSON,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Twelfth Judicial District,
                In and For the County of Hill, Cause No. DC-21-2013-157
                Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Tammy A. Hinderman, Assistant
          Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Christine Hutchison,
          Assistant Attorney General, Helena, Montana

          Lacey Lincoln, Hill County Attorney, Karen Marie Alley, Daniel
          Guzynski, Special Deputy County Attorneys, Havre, Montana

Submitted on Briefs:  April 24, 2024

Decided:  July 23, 2024

Filed:

_____
                  Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Shane Clark Johnson ("Johnson") appeals his negligent homicide conviction and sentence from the Twelfth Judicial District Court, Hill County, arising from the 2013 death of his brother Travis. We restate the following issues on appeal:

> *1. Whether Johnson is entitled to a new trial because of prosecutorial misconduct during closing arguments.*
>
> *2. Whether Johnson has established a record-based claim of ineffective assistance of counsel.*
>
> *3. Whether the District Court imposed an illegal sentence when it sentenced Johnson to a consecutive weapon enhancement term in addition to his persistent felony offender sentence.*

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In November 2013, the State charged Johnson with deliberate homicide, alleging that Johnson purposely or knowingly caused Travis's death and used a firearm in the commission of the offense. At trial, the jury failed to reach a verdict on deliberate homicide but convicted Johnson of negligent homicide with the use of a dangerous weapon. Johnson appealed and, on the State's concession, this Court reversed and remanded for a new trial. *See State v. Johnson*, 2020 Mont. LEXIS 2328. The State again charged Johnson with deliberate homicide. After Johnson filed a motion to dismiss on double jeopardy grounds, the State amended the charge to negligent homicide and the case proceeded to trial.

¶4 The second jury found Johnson guilty of felony negligent homicide, in violation of § 45-5-104, MCA, and found that he knowingly used a weapon in the commission of the

2

offense, in violation of § 45-18-221, MCA. The court sentenced Johnson as a persistent felony offender to a term of fifty years in the Montana State Prison, plus a consecutive five-year sentence enhancement for the use of a weapon. Johnson now appeals.

¶5 Johnson testified during his first trial but not at the second. Instead, the parties stipulated that part of Johnson's direct examination testimony would be read to the jury. Because that testimony and the trial court's evidentiary rulings from the first trial inform the issues Johnson raises on appeal, we include discussion of those facts as presented to the court and jury on remand after Johnson's first appeal.

*First Trial*

¶6 Judge Daniel Boucher presided over Johnson's first trial. Johnson provided notice to the State that he intended to rely on the affirmative defense of justifiable use of force. The State filed a pretrial motion in limine requesting that the court prohibit Johnson from referencing at trial, among other things, Travis's "alleged character for violence, if any, including specific acts of violence"; any of Travis's autopsy results indicating a presence of alcohol or drugs; and any alcohol or drug use, arrests, and criminal convictions Travis may have had. Johnson responded that Travis's alleged character for violence and specific acts of violence were admissible under a self-defense theory. At a hearing on the motion, the State asserted that Johnson had to present an offer of proof pretrial to determine admissibility of Travis's prior acts. Johnson's counsel disagreed but indicated that they intended to introduce three prior incidents of Travis's behavior that Johnson and their mother Donna witnessed. The court determined that the offer of proof was sufficient to

3

consider possible objections to admissibility; it did not issue an order directly ruling on the motion prior to trial.

¶7 At the beginning of Johnson's trial, the State brought up the motion in limine again. The State asserted that the incidents were too remote in time to be admissible, even if Johnson laid the foundation for a justifiable use of force defense. The court ruled that it would not prohibit Johnson from raising the issue in opening statements or voir dire and that it would "[m]ost likely . . . allow the questions [] subject to review."

¶8 Before opening statements, the State orally moved to exclude testimony from Donna and her husband Robert regarding a text message that Travis received a couple of days before his death. The new boyfriend of Travis's ex-girlfriend Bonnie sent Travis a text from Bonnie's cell phone that stated, "I'm going to blow your head off." The State also moved to exclude evidence that Bonnie had obtained a protective order against Travis "at another point in time." The court indicated it did not think the evidence was admissible and prohibited the parties from mentioning it during opening statements but granted defense counsel leave to file a written response to the oral motion. Defense counsel did not file a response.

¶9 Johnson testified that he and Travis—then ages forty-five and forty-three, respectively—lived in adjacent bedrooms in the basement of their mother's home in Havre. On the evening of Saturday, November 9, after Donna and Robert left to attend a family member's birthday dinner, Travis and Johnson were sitting in the upstairs living room, drinking beer and watching television. Although there were no outstanding problems

4

between them, Travis started saying insulting things about Johnson's daughter. Johnson told Travis he was "stupid" and to cut it out. Travis did not say anything more, so Johnson thought that the issue had resolved.

¶10 Later, according to Johnson, Travis got up and unexpectedly "sucker punched" Johnson on the side of the head, knocking off his glasses. The brothers began to fight. Johnson testified that he kept trying to push Travis off of him, telling Travis not to hit him. Travis told Johnson he was "worthless"; Johnson told Travis to leave him alone. Johnson testified that "when [he] would get away from [Travis], [Travis] would come back at [him]."

¶11 Johnson testified that he headed downstairs. Travis followed, telling Johnson that he "was better off dead." Johnson said that Travis shoved him down the stairs, but Johnson caught himself and went to his room. Johnson laid down on his bed and "figured [the fight] was over." Shortly after Johnson laid down, Travis came into Johnson's bedroom and retrieved a handgun that Johnson kept underneath his bed. Johnson asked Travis what he was doing, but Travis did not answer and took the gun across the hall to his bedroom. Johnson followed Travis because he "wanted to know [] what [Travis] plan[ned] on doing," explaining that it was "not like him to do something like this." Johnson testified that Travis had never grabbed a weapon in the past when he was mad. When defense counsel asked if Johnson was fearful at that point, Johnson replied, "I didn't want [Travis] to do anything stupid," like "[s]hoot him or me. I didn't know what was going to happen."

5

¶12 Johnson caught up with Travis in Travis's bedroom and yelled at him to put the gun down "before somebody gets hurt." Travis said nothing but did not put the gun down. Again, Johnson emphasized this was out of character, stating, "That's not him." Johnson got hold of the gun. The brothers ended up in the hallway. Johnson testified that he did not hear any gunshots go off; he knew Travis had been shot only when he fell to the floor.

¶13 After Travis fell, Johnson tried to talk to him, but Travis did not answer. Johnson "knew something was wrong" because he could not feel Travis's pulse. Johnson testified that he picked the gun up and tossed it in his room. After Johnson checked Travis's pulse again and tried to get Travis to move, Johnson testified, he "didn't know what to do," so he laid down in his bedroom. Johnson said that the next thing he recollected was "[b]eing hollered at to put [his] hands in the air." Johnson said he felt his life was in danger "[t]he whole time." Johnson stated that Travis "owned guns in the past," but he "never saw him do anything like that."

¶14 After Johnson testified, the defense called Donna as a witness. Outside the presence of the jury, the State objected to the relevance of Donna's testimony and asked the court to prohibit her from testifying about Travis's prior acts. The court allowed Donna to testify. When defense counsel asked Donna what was going on in Travis's life and she began to discuss the final two months before his death, however, the court sustained the State's relevance objection. Johnson's counsel then asked Donna what was going on with Travis on the day of his death. Donna responded, "Travis was out of control." The State objected again, and the court struck Donna's comment. Defense counsel asked Donna what she

6

observed about Travis during her interactions with him on the day he died; Donna stated, "He was drunk and belligerent." Defense counsel then ended their direct exam and their case in chief shortly after.

*Second Trial*

¶15 Judge Matthew J. Cuffe presided on remand. At a pretrial conference before Johnson's second trial, the prosecutor orally moved the court to rule that all of Judge Boucher's orders and rulings prior to remand were the law of the case and binding on parties on retrial. Defense counsel stated they would need additional time to review the orders "before making a decision." The court then ruled:

> The previous orders are in effect until challenged, or asked to be reconsidered, or anything like that. And so if there is an Order out there that no longer applies, or based on the remand from the Supreme Court, then obviously we will deal with that. Otherwise, the previous evidentiary orders, and rulings, and all of those things from my perspective, absent somebody showing me some authority to the contrary, will remain in place. So if there's—if there's a specific Order out there that either the State or the defense believes should be or is different, then that needs to be brought to my attention. If I haven't ruled on it, looked at it and made a decision[] on it[,] we are going to go under the previous judge's ruling.

Johnson's counsel did not ask the court to reconsider any prior rulings.

¶16 In opening statements, Johnson's counsel framed what happened on the night of Travis's death as a "tragic accident" resulting from the struggle over the gun. Johnson did not present a defense of justifiable use of force, which would have been contrary to his accidental death theory.

¶17 In closing arguments, the prosecutor discussed the court's jury instruction on the elements of negligent homicide. The prosecutor said that jurors may believe that the State

proved Johnson purposely killed Travis but "that is not what the State has charged." The prosecutor explained that the jury "could find that [Johnson] took that gun without the purpose to kill his brother or with the purpose to scare, to threaten his brother." He continued, "Either way, if he's bringing that gun out to purposely kill his brother, or bringing that gun out to scare, threaten and harass his brother who just humiliated him, it's a gross deviation of the standard of care you may find. And that is negligent homicide." The prosecutor noted the amount of alcohol consumed by both Travis and Johnson and said the jury may find that consuming that much alcohol, getting into a fight, and introducing a gun into the situation was a "gross deviation from [the] standard of care." The prosecutor again stated that "this is a negligent homicide case. It's not a deliberate homicide case." He additionally noted it was not a "self-defense case," which is why the jury would not see an instruction about justified use of force. The prosecutor told the jury it would "see what the State's burden is[,] and that's negligent homicide." He continued, "Sometimes it's the thought that prosecutors charge too much in some places. This is a lower standard than deliberate homicide. This is negligent homicide."

¶18 The State next discussed how the parties "tell a story" through circumstantial evidence. The prosecutor referenced the court's jury instructions regarding witness credibility and Johnson's statements. He began discussing the statements Johnson made to law enforcement and at the previous trial. The prosecutor told the jury:

> And when you think about [Johnson's] story and you've scrutinized it, there was no evidence at all that Travis was ever suicidal. He said that in his statement[:] ["]I was wondering if he was going to shoot himself.["] And you

could evaluate that statement . . . and it's required as your function as a juror. But he says, ["]I was worried he was going to go shoot himself.["]

He offered to the jury that "[Johnson] never gave any facts if Travis had ever been suicidal." The prosecutor continued discussing Johnson's testimony, stating, "Again, I don't think you'll find any evidence that Travis was ever suicidal." The prosecutor urged the jury to "look at the . . . contradictions [in Johnson's testimony] versus the physical evidence in this case."

¶19 The prosecutor discussed Johnson's statements to police after the incident that he acted in self-defense. He reviewed Johnson's testimony from the previous trial. The prosecutor then told the jury, "When you think about that version of events, Mr. Johnson was worried about his brother even though there's no fact that Travis was ever going to hurt himself. But this is what you get to do, you get to analyze his statement and figure [out] what makes sense." The prosecutor then reviewed the State's exhibits and asked the jury to consider "[t]hat the evidence in this case, the blood evidence, the DNA evidence inclusively beyond a reasonable doubt shows that Shane Johnson grabbed that gun from underneath his bed and that's negligence."

¶20 At the conclusion of the State's argument, defense counsel moved for a mistrial based on the prosecutor's statement that there was "no evidence of Travis being suicidal and how [Johnson's] reactions don't make any sense." Defense counsel explained:

> Early on, the Court had ruled that the prior evidentiary . . . rulings of Judge Boucher were in place. And one of those [rulings] [was] about evidence in regard to Travis Johnson. Travis Johnson – and this was well known to the family members at the time – was really, really out of sorts and he threatened to kill Donna Biem. He threatened to burn his ex-girlfriend, Bonnie's house

down right around this time. He received a death threat thereafter, just days before this by text from Bonnie's phone which had actually came [sic] from Bonnie's current boyfriend.

And it was clear that Travis was under some type of stress and was acting very abnormally, and Shane had every right to be concerned about what was going on with Travis. The whole family was. But we have not been able to get into that.

Defense counsel argued that the State "closed the door to the evidence here because of a successful ruling. . . . And then they attack[ed] us in closing for the very thing that they've closed the door on us with."

¶21 In response, the prosecutor stated:

Your Honor, what the defendant was allowed to get in at the prior hearing for trial was the fact that he thought that Travis would hurt himself, kill himself and I just indicated that. And even the offer of proof that was provided by [defense counsel] does not relate to anything about suicidal thoughts or ideations that were kept out. I stuck right to that issue that he didn't – there was no – he commented that he thought his brother was going to kill himself and that was – there was no other comment made about killing himself. I kept it very narrow, Your Honor.

The court asked the parties whether there was a prior decision from Judge Boucher regarding "Travis'[s] behavior." Defense counsel explained that there was an "oral order" that Judge Boucher made during Johnson's first trial. The court denied Johnson's motion, concluding that the State's argument was an "appropriate" comment on Johnson's testimony. Johnson's motion for mistrial did not include any discussion of the prosecutor's comment about the State's charging decisions, and he made no objection to that comment at trial.

**STANDARDS OF REVIEW**

¶22 We review a district court's decision on a motion for mistrial for an abuse of discretion. *State v. Pierce*, 2016 MT 308, ¶ 17, 385 Mont. 439, 384 P.3d 1042 (citing *State v. Moree*, 2010 MT 148, ¶ 11, 357 Mont. 24, 235 P.3d 585). A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial prejudice. *Pierce*, ¶ 16 (citation omitted). We generally do not address a claim of error, including issues of prosecutorial misconduct, when the defendant did not object at trial, except in our discretionary exercise of plain-error review. *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506 (citations omitted).

¶23 We review sentences beyond one year of incarceration for legality. *State v. Martin*, 2019 MT 44, ¶ 12, 394 Mont. 351, 435 P.3d 73 (citing *State v. Hornstein*, 2010 MT 75, ¶ 9, 356 Mont. 14, 229 P.3d 1206; *State v. Ariegwe*, 2007 MT 204, ¶ 174, 338 Mont. 442, 167 P.3d 815). "Whether a sentence is legal is a question of law, which we review for correctness." *Martin*, ¶ 12 (citing *Ariegwe*, ¶¶ 174-75).

**DISCUSSION**

¶24 *1. Whether Johnson is entitled to a new trial because of prosecutorial misconduct during closing arguments.*

¶25 The Sixth Amendment of the United States Constitution and Article II, § 24 of the Montana Constitution guarantee criminal defendants the right to a fair trial by a jury. A prosecutor's misconduct therefore may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial. *Clausell v.*

11

*State*, 2005 MT 33, ¶ 11, 326 Mont. 63, 106 P.3d 1175 (citing *State v. Gray*, 207 Mont. 261, 266-67, 673 P.2d 1262, 1265-66 (1983)).

¶26    When reviewing a preserved claim of prosecutorial misconduct, we first consider whether the prosecutor's comments were improper. *Pierce*, ¶ 24 (citing *State v. Lindberg*, 2008 MT 389, ¶ 25, 347 Mont. 76, 196 P.3d 1252). Next, we determine whether the improper comments prejudiced the defendant's right to a fair trial. *Pierce*, ¶ 24 (citing *Lindberg*, ¶ 25).

The District Court's denial of Johnson's motion for mistrial

¶27    Johnson argues that the District Court erred when it denied his motion for a mistrial because the State successfully excluded evidence of specific instances of Travis's conduct and then told the jury in closing argument that there was no evidence Travis was suicidal. Johnson asserts this amounted to "improper legal maneuvering," referencing our holding in *Hall v. Big Sky Lumber & Supply, Inc.*, 261 Mont. 328, 863 P.2d 389 (1993), that counsel cannot ask the court to exclude evidence and then take advantage of the other party's inability to mention the evidence by implying it does not exist. *Hall*, 261 Mont. at 337, 863 P.2d at 395. Johnson asserts that the cumulative effect of this conduct deprived him of a fair and impartial trial as guaranteed by the Sixth Amendment of the United States Constitution and Article II, § 24 of the Montana Constitution.

¶28    We apply a deferential standard to a district court's ruling on a motion for mistrial because the trial judge is in the best position to decide on the motion. *Pierce*, ¶ 17 (citing *Moree*, ¶¶ 11, 18). Our review of the record leads us to conclude that the District Court

12

did not abuse its discretion in finding the prosecutor's comments acceptable. The prosecutor's comments were made within the context of Johnson's statements to police and his testimony at the first trial, which were stipulated into evidence at his second trial. Johnson did not say either time that Travis had suicidal ideation. His theory before Judge Boucher was that evidence of Travis's violent behaviors was relevant to Johnson's justifiable use of force defense. Before the first trial, Johnson did not seek admission of evidence to show that Travis had been suicidal. The most he said about Travis's intentions was that Johnson did not want Travis to "do anything stupid," like shooting himself or Johnson, and Johnson followed him to find out what he was going to do. Johnson did not introduce the theory of suicidal ideation until he moved for a mistrial at the conclusion of his second trial. The District Court reasonably concluded that the prosecutor permissibly commented on the evidence admitted at trial when he stated that Johnson's testimony did not provide any rationale for believing Travis was suicidal. Because the prosecutor's comments were not improper, the court did not abuse its discretion in denying Johnson's motion for mistrial.

Plain-error review of statements to which Johnson did not object

¶29 Johnson requests that this Court exercise plain-error review of the prosecutor's alleged misconduct in discussing the State's charging decisions, to which Johnson did not object at trial. He contends that the State improperly referenced facts not in evidence regarding alleged public opinion when the prosecutor commented in closing argument that "[s]ometimes it's [] thought that prosecutors charge too much in some places." Johnson

13

contends the prosecutor insinuated that the State undercharged Johnson when it told the jury it could find that Johnson purposely killed Travis, which would be deliberate homicide, "but that is not what the State has charged." Johnson argues that this improperly "invited the jury to consider the State's charging decision—and its reasonableness or propriety—when rendering its verdict." He adds that the prosecutor's statement was false or misleading because the State originally did charge Johnson with deliberate homicide and amended the charge on remand only after Johnson raised a double-jeopardy violation. The effect of these improper arguments, Johnson asserts, tainted his trial and resulted in a fundamentally unfair proceeding warranting plain-error review.

¶30    The State does not claim the prosecutor's comment about its charging decisions was proper but argues that Johnson has not met his burden to establish that this Court should invoke plain-error review. The State contends that the prosecutor's statement was brief, isolated, and made in the context of a permissible discussion of the elements of the offense.

¶31    Our decision to invoke plain-error review is "a discretionary one." *State v. Hayden*, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091 (citing *State v. Rosling*, 2008 MT 62, ¶ 77, 342 Mont. 1, 180 P.3d 1102). We invoke plain-error review sparingly, on a case-by-case basis, and only in a narrow class of cases. *State v. Lackman*, 2017 MT 127, ¶ 9, 387 Mont. 459, 395 P.3d 477 (citing *State v. Godfrey*, 2004 MT 197, ¶ 22, 322 Mont. 254, 95 P.3d 166). The appealing party carries the burden of proving that our decision not to exercise discretionary review of the alleged error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings,

14

or compromise the integrity of the judicial process. *State v. Favel*, 2015 MT 336, ¶¶ 13, 27, 381 Mont. 472, 362 P.3d 1126 (citations omitted). We "consider alleged improper statements during closing argument in the context of the entire argument." *State v. Lawrence*, 2016 MT 346, ¶ 13, 386 Mont. 86, 385 P.3d 968 (quoting *Aker*, ¶ 24). A prosecutor's statement that misinforms the jury of a fundamental legal principle may constitute plain error when it substantially prejudices a defendant's right to a fair trial. *See Lawrence*, ¶ 19 (prosecutor's statement in closing argument that the presumption of innocence "no longer exists" violated defendant's fundamental rights, warranting reversal as plain error); *State v. Wagner*, 2009 MT 256, ¶¶ 20-21, 352 Mont. 1, 215 P.3d 20 (prosecutor's repeated and deliberate use of defendant's invocation of the right to silence warranted reversal under plain-error review).

¶32    The prosecutor's comments here do not warrant plain-error review. The statement about charging negligent homicide instead of deliberate homicide was a single comment made within the context of an otherwise proper discussion of the elements of the offense and how the evidence satisfied those elements. The prosecutor repeatedly identified the case as a negligent homicide case and appropriately described the State's burden of proof. His statement about a "lower standard" was made while explaining that the jury did not have to be convinced that Johnson intended to kill his brother. We are not persuaded that failing to review the claimed error would leave unsettled the question of the fundamental fairness of the trial.

¶33 Johnson has not established that the prosecutor's closing arguments entitle him to a new trial.

¶34 *2. Whether Johnson has established a record-based claim of ineffective assistance of counsel.*

¶35 Johnson argues that his counsel provided constitutionally ineffective assistance when they failed to offer evidence during the second trial of Travis's behaviors prior to the fatal shooting. Johnson contends that his counsel unreasonably chose not to attempt to introduce any evidence of Travis's behavior because counsel mistakenly believed that Judge Boucher ruled it was inadmissible and the court on remand adopted Judge Boucher's rulings. Johnson argues this belief was mistaken because the court stated, "The previous orders are in effect *until challenged, or asked to be reconsidered. . . .*" His counsel's failure to challenge that ruling, Johnson contends, prejudiced his defense. Johnson's appellate brief points to several pieces of evidence regarding Travis's behavior before his death that were not presented to the jury.

¶36 The right to effective assistance of counsel is a fundamental right guaranteed by both the United States and Montana Constitutions. *Golie v. State*, 2017 MT 191, ¶ 7, 388 Mont. 252, 399 P.3d 892 (citing U.S. Const. amends. VI, XIV; Mont. Const. art. II, § 24). We review ineffective assistance of counsel (IAC) claims by applying the two-part test from *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under this test, the defendant must show: (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant. *State v. Racz*, 2007 MT 244, ¶ 22, 339 Mont. 218, 168 P.3d 685 (citation omitted).

16

¶37 "As a threshold matter, this Court must determine whether a direct appeal or a postconviction relief hearing is the more appropriate forum for the claim." *State v. Hatfield*, 2018 MT 229, ¶ 75, 392 Mont. 509, 426 P.3d 569. IAC claims are fact-dependent considerations that usually may be reviewed only by referring to a developed record. *Hatfield*, ¶ 75 (citing *State v. Greene*, 2015 MT 1, ¶ 17, 378 Mont. 1, 340 P.3d 551). We thus consider "only record-based ineffective assistance of counsel claims on direct appeal." *Hatfield*, ¶ 18. "If the record does not disclose the reason for counsel's allegedly deficient act or omission, the defendant must raise the claim in a petition for postconviction relief." *Hatfield*, ¶ 75 (citing *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095). To the extent that such claims are reviewable, they present mixed questions of law and fact, which we review de novo. *Hatfield*, ¶ 18 (citing *State v. Chafee*, 2014 MT 226, ¶ 11, 376 Mont. 267, 332 P.3d 240).

¶38 Johnson's trial counsel indicated that he did not object during the State's closing argument because he was "uncertain how the [c]ourt would rule," but the record does not reflect counsel's reason for not attempting to introduce evidence of Travis's behavior in the days prior to the shooting or what evidence counsel did or did not consider prior to the second trial. Johnson did tell the jury that Travis was acting out of character but said only that he "didn't know" what Travis was going to do, like "[s]hoot him or me." Because the trial record does not include Johnson's counsel's explanation of his trial strategy concerning whether to seek introduction of additional evidence of Travis's behavior or how

17

that might have supported his theory that the shooting was accidental, "this Court will not speculate on the claimed error." *Aker*, ¶ 37 (citation and internal quotation omitted).

¶39 Johnson's ineffective assistance claims are not record-based and thus are more appropriately raised in a petition for postconviction relief. Should Johnson pursue timely postconviction relief, upon appropriate application, the District Court should assign counsel if Johnson otherwise qualifies. *See Hatfield*, ¶ 76 (citing § 46-21-201, MCA).

¶40 *3. Whether the District Court imposed an illegal sentence when it when it sentenced Johnson to a consecutive weapon enhancement term in addition to his persistent felony offender sentence.*

¶41 A person convicted of negligent homicide may be sentenced for a term of up to twenty years in prison. Section 45-5-104(3), MCA. A person designated as a persistent felony offender, however, "shall be imprisoned in the state prison for a term of not less than 5 years or more than 100 years. . . ." Section 46-18-502(1), MCA. The court sentenced Johnson to a term of imprisonment of fifty years under the PFO statute. It additionally sentenced Johnson to a consecutive prison term of five years for the use of a weapon in the commission of the offense under § 46-18-221, MCA.

¶42 "A PFO designation is not a separate crime carrying a separate sentence; rather, it is a procedural sentence enhancement required by statute." *Martin*, ¶ 16 (quoting *State v. DeWitt*, 2006 MT 302, ¶ 11, 334 Mont. 474, 149 P.3d 549 (citing § 46-18-501, -502, MCA)) (internal quotation omitted). "There is not, therefore, a separate sentence for the felony and a separate sentence for the persistent felony offender charge, but only one sentence pursuant to § 46-18-502, MCA." *DeWitt*, ¶ 11. We have thus held "[s]entences

18

imposed based upon an offender's status as a PFO replace the sentence for the underlying felony." *Martin*, ¶ 16 (citing *State v. Gunderson*, 2010 MT 166, ¶ 54, 357 Mont. 142, 237 P.3d 74; *State v. Johnson*, 2010 MT 288, ¶ 17, 359 Mont. 15, 245 P.3d 1113).

¶43 Johnson argues that because the five-year weapon enhancement was part of the sentence for his negligent homicide conviction, and the PFO sentence replaces the sentence for the charged offense, the five-year weapon enhancement also should have been replaced by the PFO sentence. The State responds that the plain language of § 46-18-221(1), MCA, provides for an additional sentence separate from that imposed under the PFO statute.

¶44 Section 46-18-221, MCA, states:

> **Additional sentence for offenses committed with dangerous weapon.**
> (1) . . . [A] person who has been found guilty of any offense, other than an offense in which the use of a weapon is an element of the offense, and who, while engaged in the commission of the offense, knowingly . . . used a firearm . . . shall, in addition to the punishment provided for the commission of the underlying offense, be sentenced to a term of imprisonment in the state prison of not less than 2 years or more than 10 years. . . .

Further, § 46-18-221(4), MCA, provides, "An additional sentence prescribed by this section must run consecutively to the sentence provided for the offense."

¶45 Our review of the legality of a sentence is "limited to determining whether 'the sentencing court had statutory authority to impose the sentence, whether the sentence falls within the parameters set by the applicable sentencing statutes, and whether the court adhered to the affirmative mandates of the applicable sentencing statutes.'" *Martin*, ¶ 12 (quoting *Ariegwe*, ¶ 174). "A sentence is legal if it falls within statutory parameters and is

19

constitutional." *Martin*, ¶ 12 (citing *State v. Kotwicki*, 2007 MT 17, ¶¶ 13, 19, 335 Mont. 344, 151 P.3d 892; *State v. Garrymore*, 2006 MT 245, ¶ 9, 334 Mont. 1, 145 P.3d 946).

¶46    "This Court has repeatedly held that the role of courts in applying a statute has always been 'to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.'" *State v. Goebel*, 2001 MT 73, ¶ 16, 305 Mont. 53, 31 P.3d 335 (quoting § 1-2-101, MCA). "Statutory language must be construed according to its plain meaning and if the language is clear and unambiguous, no further interpretation is required." *Goebel*, ¶ 16 (citations omitted).

¶47    A plain reading of § 46-18-221, MCA, leads us to agree with the State. Johnson's sentence for negligent homicide—the underlying offense—was replaced by the PFO sentence. *Martin*, ¶ 16 (citations omitted). But the plain language of the sentence enhancement statute provides that the court "shall, *in addition to the punishment provided for the commission of the underlying offense*," sentence the defendant to an "additional sentence" of "not less than 2 years or more than 10 years[.]" Section 46-18-221(1), MCA (emphasis added). The statute makes clear that a weapon enhancement is added to whatever sentence may be allowed for the substantive offense charged, not subsumed within it. In any case, the sentence Johnson received is within the maximum allowed for a persistent felony offender. Because Johnson's sentence was within the statutory parameters of §§ 46-18-502(1) and -221, MCA, the District Court imposed a legal sentence when it sentenced him as a PFO for the underlying felony and imposed an additional

20

consecutive sentence for Johnson's use of a firearm in the commission of the underlying felony.

## CONCLUSION

¶48 We affirm Johnson's conviction and sentence for negligent homicide without prejudice to his ability to file a postconviction petition for his claim of ineffective assistance of counsel.

/S/ Beth Baker

We Concur:

/S/ James Jeremiah Shea
/S/ Laurie McKinnon
/S/ Ingrid Gustafson
/S/ Jim Rice